OPINION OF THE COURT
Harold Hyman, J.
In this nonjury case Rose Carter, as administratrix of the goods, chattels, and credits of Bernard Carter, Esq., deceased, brings an action based upon an alleged implied-in-fact contract to recover $87,500 from defendant law firm Katz, Shandell, Katz and Erasmous. Said sum represents 50% of the $175,000 contingency fee allowed, in an order of compromise dated February 8, 1980, to Katz, Shandell, Katz and Erasmous out of a $525,000 settlement in a medical malpractice action.
Plaintiff, Rose Carter, alleges that her deceased husband, Bernard Carter as a member of the law firm of Hacker, Landau and Carter, referred at least 14 negligence cases to defendant law firm prior to the commencement of the malpractice action mentioned above. In each of said 14 cases, plaintiff alleges, Bernard Carter received 50% of the fee obtained by the Katz firm. With respect to the malpractice action at issue, plaintiff alleges that there was a referral made by Bernard Carter to the defendant law firm and that Bernard Carter performed services in conjunction *1010 with the defendant law firm which services contributed toward the earning of $175,000 fee allowed to and received by defendant law firm. The prior course of dealing between the two firms, and the mutual participation in preparing the malpractice action prior to Bernard Carter’s death, is alleged by plaintiff to be sufficient to support a cause of action based on an implied-in-fact contract to divide equally the fee in the malpractice case. This court must agree.
On September 29, 1974, Avis Guilford, an infant, was injured in a car accident. Avis was admitted to Mary Immaculate Hospital. While at Mary Immaculate certain acts of negligence were alleged to have been committed upon the child which led to the commencement of the medical malpractice action. Subsequent to the alleged malpractice, the child was transferred from Mary Immaculate to New York University Hospital.
On November 13,1974, Antoinette Guilford, the infant’s mother, retained Bernard Carter to commence an action for personal injuries. The retainer agreement signed by Ms. Guilford did not specify whether Carter was retained to commence suit for those injuries stemming from the accident, from the alleged malpractice, or both.
Defendant law firm agrees that Ms. Guilford hired Carter to represent her child in the automobile case, but contends that Ms. Guilford hired its firm directly to litigate the malpractice case. This contention is in stark contrast to the testimony and evidence adduced at trial. The testimony of Ms. Guilford unequivocally shows that Bernard Carter referred Guilford to defendant law firm. The court finds that Ms. Guilford’s testimony is clear and unambiguous on this point so that defendant’s argument that it was directly retained by Ms. Guilford as to the malpractice action is without merit. Ms. Guilford testified as follows:
the court: Miss Guilford, did you ever know the firm of Katz * * * before you were introduced there by [Mr. Carter!?
the witness: No.
the court: Did [Mr. Carter! send you to Mr. Katz’ office?
the witness: Yes. I understand he recommended him, yes.
the court: Recommended the Katz people?
*1011 the witness: Right.
the court: How would you know that?
the witness: From Mr. Carter.
the court: Actually, he [Carter] was your attorney in the first instance, wasn’t he?
the witness: Yes.
the court: * * * while she was in the hospital something was noted with respect to the child’s physical condition.
the witness: Right.
the court: As a result * * * she was then transferred by Mary Immaculate to * * * N.Y. Hospital?
the witness: Right.
the court: And was Mr. Carter still your attorney at that time?
the witness: Yes.
the court: Now, up to that time had you gone to see Mr. Katz, or the Katz firm, whoever you saw there?
the witness: No.
the court: Who sent you to the Katz firm, at that time?
the witness: Mr. Carter.
Although the evidence concerning the referral, mutual participation and past dealings would be sufficient to support an implied-in-fact contract, the most significant and probative evidence of an agreement between the two firms to divide fees would be the retainer statement as to the malpractice action in issue which, pursuant to section 691.20 of the Rules of the Appellate Division, Second Department (22 NYCRR), had to be filed with the Office of Court Administration by defendant. This retainer statement was not put into evidence by either party even though the defendant — who, as filer of the retainer statement had better access to it than plaintiff — took the position in its posttrial memorandum that the best evidence of any agreement, or lack of agreement, between the two firms would have been the retainer statement filed with the Office of Court Administration. However, in the interest of justice, this court, posttrial, requested and obtained from the Office of Court Administration, with the permission of the Appellate Divisions of the First and *1012 Second Judicial Departments, the retainer statement for the malpractice action in issue, number 7976553, which defendant had even filed nunc pro tune almost one year after its retention.
This retainer statement was prepared by defendant law firm, Katz, Shandell, Katz and Erasmous, and signed by Herbert Katz, attorney for said firm. The names of both Carter and defendant, as well as the retainer numbers assigned to Carter and defendant, both appear on this statement. The two most significant required statements on the retainer statement read as follows:
“4. If engaged by an attorney, name and office address of retaining attorney...........Bernard Carter, Esq., 1600 Central Avenue Far Rockaway, New York 11691.
“5. If claim for personal injuries, wrongful death or property damage, date and place of occurrence..........Accident/Malpractice, September 29, 1974 Catholic Medical Center, etc.”
The court is left wondering how defendant could argue that Carter had no interest whatsoever in the malpractice action and argue that the absence of the retainer statement from evidence proves the lack of an agreement to divide the fee, while, at the same time, have full knowledge of and access to the said retainer statement which, on its face, indicates Carter’s participation in the malpractice action. If, as defendant argued, its retention was a “direct” one with which Carter had no connections, then why did defendant law firm not only mention Carter in paragraph 4 of its retainer statement, but also include thereon and refer to the retainer statement name and number filed by Bernard Carter as to this very action?
There was an instruction on the statement to the effect that if paragraph 4 was answered that the filing attorney should “set forth particulars as to the fee arrangement, the type of services to be rendered in the matter”. This information was omitted. On the other retainer statement in evidence, with respect to 1 of the 10 previous dealings between the two firms, this information was likewise omitted. In this previous case the evidence (a letter and a check) indicates a 50-50 division of the total fee. In the present case, as was true of all of the earlier cases as far as can be *1013 deduced from letters and checks marked into evidence, there must have been a similar agreement to divide equally the fees. The only difference between the malpractice action and all of the other dealings between the two firms is that Bernard Carter was deceased at the time of settlement of the malpractice action and the receipt of the fee by defendant.
The retainer statement speaks for itself. Bernard Carter, as retaining attorney, retained defendant to litigate the malpractice action. This retainer conclusively proves that, as in previous dealings, Carter and defendant had an implied agreement to mutually participate in the preparation of a personal injury action in order to collect and share the fee therefrom. Not only does this retainer statement conclusively prove the existence of an implied-in-fact contract (see below), it is also some evidence of an express agreement between the two firms, which is fortified by the documentary proof of their past transactions with one another. In light of the retainer statement afore-mentioned, the defendant’s contention that Mr. Carter had no interest in the malpractice action is utterly devoid of any factual basis.
Bernard Carter, subsequent to the referral, conjoined his efforts on behalf of Ms. Guilford with those of defendant law firm; together, the two firms participated in the work, investigation, and preparation of the malpractice action. Bernard Carter was the liaison between the Katz firm and Mary Immaculate and New York Hospitals. Carter exerted much time and effort in battling hospital bureaucracy,* to obtain all of the necessary hospital records concerning Avis Guilford’s injuries resulting from the alleged malpractice. Bernard Carter wrote numerous letters to the hospitals and maintained a steady stream of correspondence with the Katz firm. A short perusal of portions of just a few of the many letters in evidence which passed between the two firms, the two hospitals and the client, definitively shows mutual participation in the preparation of and responsibility for the malpractice action.
*1014 From Bernard Carter to Herbert Katz (Jan. 13, 1975):
“Dear Herb:
“Enclosed herewith is the Mary Immaculate Hospital record.
“Please review it and let me know whether or not we have any cause of action in malpractice.
“P.S. I also sent for the report from New York University Medical Center and since they want $63.50 for their complete record, I decided to hold up on sending for it until I hear from you regarding the findings of the Mary Immaculate Hospital.” (Emphasis added.)
From Katz, Shandell, Katz and Erasmous to Bernard Carter (Jan. 15, 1975):
“Dear Mr. Carter:
“Pursuant to conversation with Genevieve, enclosed herewith please find our check for $63.50 to cover the cost of obtaining the entire record from New York University. Since we have no authorizations and no correspondence in the file from the Hospital, I thought this would make things easier if you followed through for this record.”
From Bernard Carter to New York University Hospital (Jan. 16, 1975):
“Pursuant to your letter * * * I enclose herewith my associates’ check in the amount of $63.50”. (Emphasis added.)
The above-emphasized words “we”, “malpractice” and “associates’ ” (written by Carter and responded to by defendant) indicate their perception that both were involved in the preparation of the malpractice case.
As an aside, reference must be made to the tactics used by defendant in its posttrial memorandum in this case which cannot be overlooked. In its zeal to find some basis for the contention that Carter had no interest in and did not work in connection with the malpractice action, defendant quotes this court completely out of context. Suffice it to say that this particular tactic did not go unnoticed.
In evidence are 10 “Closing Statements” filed with the Office of Court Administration of the State of New York *1015 (evidencing past dealings between the two firms). All of said statements name as attorneys, Hacker, Landau and Carter, and Katz, Shandell, Katz and Erasmous. The total fee obtained and not the percentage division thereof, is listed on each statement. However, there are, in evidence, letters and copies of checks which passed between the two firms indicating an equal division of 50% of the fee to each on some of the cases represented by the closing statements. Not all of the fee divisions are specified by letters, but this court takes as most significant the fact that every letter and check indicating what the division of the fee was, indicates the firms’ standard arrangement for an equal 50% division. Plaintiff’s contention that every case handled together by both firms resulted in a 50-50 division of fees is well supported by the evidence, while defendant offers no evidence whatsoever that would even suggest that the two firms ever did anything other than divide the fee on an equal basis.
Defendant argues that since Carter had to obtain records to commence an action for the personal injuries sustained in the automobile accident (defendant admits that it had no part in the automobile case) he should not be allowed to recover twice for doing work he was already obligated to do. Such argument is self-defeating. If, as defendant posits, it had nothing whatsoever to do with the automobile case, then any work or services that passed between the two firms, any records sent to defendant by Carter, and contact at all between the two firms, must necessarily have concerned the malpractice case. Carter performed services relating to the malpractice case that were readily accepted by the defendant, and which directly and definitively resulted in the obtainance of the fee. Defendant cannot now complain that it is being asked to share the fee; the facts and circumstances render its position equitably, legally and morally untenable.
Contracts implied in fact are inferred from the facts and circumstances of the case, and are not formally or explicitly stated in words (Wells v Mann, 45 NY 327). The only difference between an express contract and a contract implied in fact is that in the former the parties arrive at their agreement by words, while in the latter their agree *1016 ment is arrived at by a consideration of their acts and conduct; in both cases there is, in fact, a contract between the parties, the only difference being the character of the evidence necessary to establish it (Matter of Ahern v South Buffalo Ry. Co., 303 NY 545, affd 344 US 367; Allegheny Coll. v National Chautauqua County Bank, 246 NY 369).
An implied-in-fact contract arises only when the facts and circumstances are such that an intent may fairly be inferred on the parties’ part to make such a contract (17 Am Jur 2d, Contracts, § 3). The existence of an implied-in-fact contract is a question of fact to be decided by the trier of fact, and where services are rendered under circumstances which warrant a reasonable expectation of payment, even if contingent upon a result, the law may imply a promise of payment upon the happening of the “result” (22 NY Jur 2d, Contracts, § 509).
Attorneys who share services and responsibility for a legal matter but who are not partners or associates may agree in advance on a division of fees based upon such responsibility and services (Formal Opn of NY State Bar Assn, No. 414 [1975]).
The “Agreement” is no different in type than any other contract, it need not be in writing, but may be determined to exist as a result of the conduct, past or present, of the parties and as such conduct would indicate identical activity and result upon termination.
In the case at bar, the facts and circumstances, as well as the conduct of the parties, weigh heavily in favor of the existence of an implied-in-fact contract to divide the fee in the malpractice case. The defendant admits in its answer to paragraph eleven of the complaint that Bernard Carter referred many cases to its firm, and, as the defendant admits, presumably a substantial amount of services was performed by Carter to entitle him to a considerable portion of the legal fee in those cases. In the case at bar, Carter likewise performed services, not only at the defendant’s request, but also pursuant to the implied agreement that each had with the other to perform services in order to obtain a fee, and those services were accepted by defendant thereby forming the basis for the implied agreement to share in the fee that the two firms earned through mutual *1017 participation. The retainer statement containing the names and retainer numbers of both Bernard Carter and defendant law firm irrefutably indicates the intent of both Carter and defendant to mutually participate in the preparation of the case and to divide the fee equally as they had in the past. The proof shows that Bernard Carter, in this instance as in all of the other previous matters, was not acting as a philanthropist. He must have expected, and rightfully so, to receive consideration for his services for participating in the preparation, by investigation and otherwise, of the malpractice case. A preponderance of the credible evidence unequivocally points toward the existence of an implied-in-fact contract to divide the resulting fee equally.
The court will not gloss over the many ethical considerations which come into play when law firms divide fees in cases of mutual participation; rather the court will address itself to this question. Subdivision 1 of section 491 of the Judiciary Law allows for “an agreement between attorneys and counsellors-at-law to divide between themselves the compensation to be received.” DR 2-107 of the Code of Professional Responsibility sets forth guidelines for such a division:
“(A) A lawyer shall not divide a fee for legal services with another lawyer who is not a partner in or associate of his law firm or law office, unless:
“(1) The client consents to employment of the other lawyer after a full disclosure that a division of fees will be made.
“(2) The division is made in proportion to the services performed and responsibility assumed by each.”
With respect to paragraph (1), there has been no testimony on the issue of whether Ms. Guilford was informed that the two firms were to split the fee from her case; however, Ms. Guilford signed retainer agreements with each firm separately. She first signed with Carter and thereafter with the Katz firm after the referral to defendant by Carter. That she remained in contact with Bernard Carter even after she contacted defendant is indicated by letters in evidence. Though it is not known whether Ms. Guilford knew of the exact arrangements between her two *1018 retained attorneys (a fact to which most clients are uninformed), it can be inferred from the evidence adduced at trial that Ms. Guilford knew that she had two attorneys working for her. She was in no way disadvantaged by any lack of knowledge. A client is simply to be made aware that another attorney is jointly or independently representing his or her interests at no additional expense to her therefor. Any further elaboration or specificity regarding the exact arrangement between the collaborating attorneys is not ethically mandated by this code provision. In any event, it does not appear that there has been any intentional subterfuge on the part of either firm regarding their fee arrangement. This method of dealing admittedly may not strictly comport with the guidelines of DR 2-107 of the Code of Professional Responsibility, but it certainly does not fall far from this rule’s ethical parameters. Whatever minor transgressions one might perceive, this court cannot condone this defendant’s use of the code’s provisions as a shield to avoid its legal, ethical and moral obligations. It would be a mockery of justice if this court were to allow the defendant to raise ethical rules, which it may have equally violated, to shield itself from a legitimate claim and thereby unjustly enrich itself.
DR 2-107 (A) (2) of the Code of Professional Responsibility governs the propriety of fee division. But American Bar Association (ABA) opinions and New York State case law are also probative on the issue of whether a 50-50 division in the present case would be ethically permissible. The American Bar Association Committee on Professional Ethics has held that a mere recommendation is not a sufficient basis for a forwarding fee. There must be some sharing of work or responsibility. The services, however, may be rendered even merely by correspondence. (ABA Committee on Professional Ethics [1967 ed], Formal Opns Nos. 97, 153.) Although the division must be based on sharing service and responsibility, the committee refuses to measure the propositions thereof or to apportion the fees. The amount of the fee presents no ethical question (ABA Committee on Professional Ethics [1967 ed], Formal Opn No. 204), particularly so where defendant makes no claim that the deceased had ever refused to contribute more substantially (Fried v Cahn, 239 App Div 213, 216).
*1019 The weight of this State’s case law comports with the guidelines set forth by the ABA committee. In the case of Oberman v Reilly (66 AD2d 686, 687), the Appellate Division cited to its decision in Jontow v Jontow (34 AD2d 744, 745), in which it observed that an agreement between attorneys to divide a fee was not prohibited by the canons of ethics where both contributed to the earning of the fee; the court likewise concluded in Oberman that the attorneys were entitled to share the fee equally upon appropriate proof that the attorney of record, Oberman, performed “some work, labor or services which contributed toward the earning of the fee.” (Emphasis added.)
In the case of Bohm v Holzberg (69 Misc 2d 469, 470), the Appellate Term held: “there was no professional impropriety in agreeing to an equal division of the net fee without a concomitant agreement for an equal division of the work and responsibility, provided there was some division of services and responsibility, and the party seeking to enforce the agreement actually performed some substantial services.” (Emphasis added.)
In the case of Sterling v Miller (2 AD2d 900), affirmed by the Court of Appeals (3 NY2d 778), the defendant claimed that the plaintiff “contributed negligibly toward the earning of the fee”; the Appellate Division held that: “The agreement between the appellant and the respondent Miller to split fees was valid and enforcible, regardless of respondents’ claim that appellant, after obtaining the original retainer, contributed negligibly towards the earning of the fee, especially since there is no claim that appellant ever refused to contribute more substantially (Fried v. Cahn, 239 App. Div. 213.)”
Here, as in the above-quoted case, the defendant never offered proof that Carter refused to perform any service requested of him by said defendant in connection with the malpractice action; the proof is actually to the contrary. In fact, it has not been shown that defendant did any more work towards the earning of the fee than Carter did.
The defendant attempts to distinguish the cases above on the ground that these cases all involved express agreements. However, an implied-in-fact contract carries as much weight as, and is as binding as, an express contract *1020 (Matter of Ahern v South Buffalo Ry. Co., 303 NY 545, affd 344 US 367, supra). None of the cases quoted above limits its holding to express contract alone. Implied-in-fact contracts, being as binding as express contracts, can likewise support a cause of action for division of fees among attorneys.
The two firms to the instant litigation apparently had been “doing business” in a certain way for a long period of time. All of the evidence indicates that the parties regarded the malpractice action as they had all other cases of mutual participation. The facts and circumstances surrounding the malpractice action, including the history of prior conduct, the evidence concerning the nature of the services performed in the present case, and the evidence of the retainer statement, require the court, in good conscience, to find that an implied-in-fact contract to divide equally the fee in the malpractice case existed.
Accordingly, this court holds that plaintiff is entitled to judgment in the amount of $87,500, with interest from the date of defendant’s receipt of payment pursuant to the order of compromise, with costs and disbursements of this action.

 Mary Immaculate, scene of the alleged malpractice, claimed to have no knowledge of any hospital records other than emergency treatment for Avis Guilford. Carter had to resort to evidencing to the hospital the I.D. bracelet placed on Avis’ wrist when admitted to prove the existence of treatment she received at said hospital.