JOHN G. PHILLIPS *et al.*, Plaintiffs-Appellants, v. EDWARD JOYCE *et al.*, Defendants-Appellees.

First District (4th Division)  No. 87—0503

Opinion filed April 21, 1988.

David A. Novoselsky & Associates, of Chicago (David A. Novoselsky, John F. Klebba, and Carol A. Wilczynski, of counsel), for appellants.

Madigan & Getzendanner, of Chicago (Vincent J. Getzendanner, Jr., and David A. Upah, of counsel), for appellees.

JUSTICE LINN delivered the opinion of the court:

Plaintiffs are John G. Phillips, an attorney, and his incorporated law firm, John G. Phillips, Ltd., who filed a contract action against defendants, Edward Joyce and Joyce and Kubasiak,[1] seeking an accounting, the imposition of a constructive trust, and restitution of one-half of the fees that defendants obtained in connection with certain class action litigation. Defendants successfully moved to dismiss the complaint on the grounds that the parties' contract violated Disciplinary Rule 2—107 of the Illinois Code of Professional Responsibility, entitled "Division of Fees Among Lawyers." 107 Ill. 2d R. 2—107.

On appeal, Phillips contends that (1) Disciplinary Rule 2—107 does not bar his cause of action since joint fee arrangements among law firms are legally enforceable; (2) Joyce is equitably estopped from denying the enforceability of the contract; and (3) the motion to dismiss the complaint referred to matters outside the pleadings and the trial court accordingly erred in granting the motion.

We reverse and remand.

BACKGROUND

In 1982, certain individuals hired Phillips to represent them in a lawsuit against a financial brokerage firm. They agreed that Phillips would receive as attorney fees one-third of amounts recovered by settlement or verdict.

On September 27, 1982, Phillips filed an action in State court on behalf of nine individuals and all persons similarly situated, alleging

---

[1]For convenience, the individuals and their law firms are hereinafter referred to as "Phillips" and "Joyce" as if they were singular, rather than collective, pronouns.

fraud, breach of contract, conversion and conspiracy to defraud. (*De-Graff v. Serhant* (1982), No. 82 CH 8331.) On the same day, Joyce filed a class action in Federal court, alleging various Federal causes of action as well as State statutory and common law counts. (In re Financial Partners Class Action Litigation (1982), No. 82 C5910.) Both matters arose from the same conduct.

Shortly thereafter, Joyce approached Phillips to suggest that the State court plaintiffs be added to the Federal case and that the two firms work together on the class action.[2]

According to Phillips, the two orally agreed to work together on the class action as a joint venture, with both firms sharing the work and the fees. Joyce, having represented that he had substantial expertise in securities and commodities class action litigation, was to manage the action and handle pretrial proceedings and discovery. Phillips was to undertake the actual trial of the class action because of his substantial trial expertise in State and Federal court.

The parties' agreement further provided that all fees recovered in the class action were to be shared equally by Phillips and Joyce. Phillips' State suit was to be held in abeyance while the Federal court matter was pursued. In furtherance of their agreement, the parties by letter informed all class clients that Phillips and Joyce were jointly representing their interests and that the clients must each sign a new contingent fee agreement. In this letter, which went out over Joyce's signature, the class members were told that Philips and Joyce's "combined efforts" would lead to "the swiftest and most economically satisfactory conclusion" of the litigation and that "[i]n order to further [the parties'] joint representation" of the classes' interests, the class members would have to sign the new fee agreements.

In a letter to Phillips, Joyce represented that he had attempted to contact "[Phillips'] clients in an effort to have them sign a Contingent Fee Agreement engaging both [Phillips'] and [Joyce's] firm jointly." Thereafter, Phillips obtained the signatures of the clients and sent Joyce a copy of the fee contracts.

Phillips' complaint alleges that Joyce began actively pursuing the litigation without dividing work with Phillips, keeping him informed, or even returning his phone calls. He further contends that Joyce prepared and sent to all of the class action clients a new fee agreement

---

[2]The facts are taken from Phillips' complaint, which are admitted by Joyce solely for the purpose of the motion to dismiss, and from Phillips' response to the motion to dismiss, as well as the amended complaint, for which leave to file was denied. All of these documents are of record.

which only referred to Joyce as the clients' attorney.

Following the resolution of the Federal class action, Joyce, who had been appointed lead counsel, submitted to the Federal court a petition for attorney fees due to the lawyers involved in the case. Joyce represented that his fees were $956,230 and that Phillips' fees totalled $11,600. In the Federal court, fees were awarded according to the time and expenses each firm had expended.

Phillips then filed his complaint to impress a constructive trust for restitution and for an accounting based on the oral contract he had with Joyce. In response, Joyce filed a motion to dismiss the complaint pursuant to section 2—615 of the Code of Civil Procedure (Ill. Rev. Stat. 1985, ch. 110, par. 2—615). He asserted that Phillips' complaint failed to state a cause of action because the agreement violated DR 2—107 of the Code of Professional Responsibility (107 Ill. 2d R. 2—107).

The trial court agreed with the position put forth by Joyce and granted the motion to dismiss, with prejudice.

## Opinion

### THE PROCEDURAL POSTURE OF THE ACTION

■ The primary issue on appeal is the application of DR 2—107 to the alleged agreement between Philips and Joyce. Before reaching the substance of this argument, however, we must address a procedural matter. The motion to dismiss was ostensibly brought pursuant to section 2—615 of the Code of Civil Procedure (Ill. Rev. Stat. 1985, ch. 110, par. 2—615). As such, it attacks the legal and factual sufficiency of the complaint, which, if well pleaded, is admitted as true. Joyce's motion, we believe, asserts an affirmative defense—that the contract is unenforceable because it violates one of the disciplinary rules governing ethical conduct by attorneys. Therefore, the appropriate vehicle for moving to dismiss the action ordinarily would have been section 2—619. (Ill. Rev. Stat. 1985, ch. 110, par. 2—619.) Under that provision, the moving party is required to file supporting affidavits if the grounds for the motion are not apparent on the face of the complaint. The court can hold a limited evidentiary hearing on the matters alleged to affirmatively bar the action.

Joyce argues that the motion is proper under section 2—615, however, because the complaint fails to establish on its face that it was not in violation of the disciplinary rule. Since the court could and did determine that the complaint alleged an agreement that violated DR 2—107 *as a matter of law*, the matter was properly dismissed for fail-

ure to state an actionable claim.

While supreme court rules have the force of law and a contract that violates the disciplinary rules is unenforceable (*Marvin N. Benn & Associates, Ltd. v. Nelson Steel & Wire, Inc.* (1982), 107 Ill. App. 3d 442, 437 N.E.2d 900), we do not believe that the agreement as alleged runs afoul of the disciplinary rule. However, if Joyce knew of undisputed facts that would establish a violation under DR 2—107, he could have moved for involuntary dismissal pursuant to section 2—619 or for summary judgment. The issues and undisputed facts would then be clearly defined. Instead, Joyce chose to move for dismissal under section 2—615; the facts we are limited to considering are those which Phillips sets out in the two complaints that are of record, the original and amended complaints.

The trial court, similarly bound, nevertheless took notice of the Federal court's memorandum opinion, which apportioned the attorney fees in the Federal class action. This result points up the dangers of commingling section 2—615 and section 2—619 motions, a recurring problem that we recently warned against in *Rowan v. Novotny* (1987), 157 Ill. App. 3d 691, 510 N.E.2d 1111. We noted that trial judges should not countenance mixed motions because we should not be forced to "speculate as to whether the circuit court has found a failure to state a cause of action or has found that some affirmative matter precludes relief, thus necessarily finding that a cause of action was stated." 157 Ill. App. 3d at 695, 510 N.E.2d at 1113.

■ We find that the trial court's consideration of the Federal court's memorandum opinion on a section 2—615 motion to be problematical. We must assume that, as a result, the trial court's decision was premised in part on facts not pleaded in the complaint and outside its scope, insofar as the challenge to the complaint was failure to state a cause of action.[3] Allowing the interjection of an issue outside of the pleadings accordingly prejudiced Phillips, who was not challenging the action of the Federal court. His claim for half of Joyce's fees is premised on their agreement, a matter separate from the Federal court's award of fees based on hours expended.

Because of the trial court's misplaced focus, we must independently determine whether or not Phillips' pleadings, liberally construed, state a cause of action.

Since Joyce does not challenge the sufficiency of the facts insofar as they set out the elements of an oral contract, the central question

---

[3] In fact, the record indicates that the court did rely on the Federal court's memorandum in its decision.

turns on the interpretation of DR 2—107. This rule provides in its entirety:

"(a) A lawyer shall not divide a fee for legal services with another lawyer who is not a partner in or associate of his law firm, unless

(1) the client consents in a writing signed by him to employment of the other lawyer, which writing shall fully disclose (a) that a division of fees will be made, (b) the basis upon which the division will be made, including the economic benefit to be received by the other lawyer as a result of the division, and (c) the responsibility to be assumed by the other lawyer for performance of the legal services in question;

(2) the division is made in proportion to the services performed and responsibility assumed by each, except where the primary service is the referral of the client to another lawyer and (a) the receiving lawyer fully discloses that the referring lawyer has received or will receive economic benefit from the referral and the extent and basis of such economic benefit and (b) the referring lawyer agrees to assume the same legal responsibility for the performance of the services in question as if he were a partner of the receiving lawyer; and

(3) the total fee of the lawyers does not exceed reasonable compensation for all legal services they rendered to the client.

(4) For purposes of this rule, "economic benefit" shall include (a) the amount of participation in the fee received with regard to the particular matter; (b) any other form of remuneration passing to the referring lawyer from the receiving lawyer, whether or not with regard to the particular matter; and (c) an established practice of referrals to and from or from and to the receiving lawyer and the referring lawyer.

(b) This disciplinary rule does not prohibit payment to a former partner or associate pursuant to a separation or retirement agreement."

PRE-CODE CASES

Although this rule was adopted by the Illinois Supreme Court effective 1980, it did not spring forth fully formed like Athena from the head of Zeus. In *Monahan v. Heirich* (1955), 4 Ill. App. 2d 373, 124 N.E.2d 39 (abstract of opinion), for example, the court upheld two attorneys' contract which contemplated an equal division of fees whenever one attorney became associated with the other in personal injury

cases. Since the agreement envisioned a division of services or responsibility, it was held not to violate the "canons of professional ethics."[4]

In *Brick v. Hirsch* (7th Cir. 1964), 331 F.2d 251, the court enforced a sharply disputed, oral fee-sharing agreement in a tax litigation matter. The defendant attorney, who did not specialize in tax matters, brought in plaintiff attorney to assist, agreeing to give him one-third of the recovery, the other two-thirds to be divided equally between defendant and another attorney. The court did not discuss the canons of ethics but simply affirmed the trial court's ruling as not being against the manifest weight of the evidence.

The same court upheld another fee-sharing agreement, against a challenge based in part on the canons of ethics, in *Disney v. Pritzker* (7th Cir. 1967), 385 F.2d 572. Attorneys representing two different groups of Delaware Indians entered into an agreement to jointly represent all of the Delawares, to save expenses and improve efficiency. The court found that the services performed should be viewed as a unit, for the benefit of all of the clients, and that the agreement did not violate "Canon 34 of the Canons of Professional Ethics," which permitted the splitting of fees only when based upon a division of services or responsibility. 385 F.2d at 577.

More recently, the Illinois Supreme Court upheld a fee-sharing agreement between attorneys against the client's claim that he did not have an attorney-client relationship with one of the attorneys and that the fee-sharing agreement was not disclosed to him. (*Kravis v. Smith Marine, Inc.* (1975), 60 Ill. 2d 141, 324 N.E.2d 417 (two judges dissenting).) The plaintiff filed a personal injury and wrongful death action against several defendants. In 1968 he executed a contingent fee agreement with attorneys Cole and Kotin. Nothing in the agreement explicitly set out the basis for the division of the fee, although Cole and Kotin had agreed between themselves that they would share it equally.

Cole had brought Kotin into the case after another attorney who was working with Cole withdrew, in part over a dispute as to the division of the fee. Kotin assumed the majority of the work on the case although Cole consulted with him, signed various pleadings and at-

---

[4]Although the abstract opinion does not specify the source of the canons of professional ethics, it likely refers to the then existing version of Canon 34 of the American Bar Association Canons of Professional Ethics. The Illinois Code of Professional Responsibility was modelled after the 1977 version of the ABA Code of Professional Responsibility. See Ill. Ann. Stat., ch. 110A, DR 1—101 *et seq.*, Committee Comments, at 686 (Smith-Hurd 1985). See also *Leoris v. Dicks* (1986), 150 Ill. App. 3d 350, 353, 501 N.E.2d 901.

tended some of the discovery proceedings and a pretrial conference.

Following a settlement with one of the defendants, plaintiff met with Kotin to discuss the disbursement of the settlement money. Plaintiff signed a disbursement petition which indicated that Kotin and Cole would receive 25% of the settlement. A few days later, however, plaintiff questioned why Cole was to receive half of the total attorney fee and asked that that agreement be changed. After Cole told him of the prior arrangement with the other attorney, in which Cole was to have gotten two-thirds of the fee, the plaintiff objected to Cole's receiving any more money. However, he did not object to the distribution of 50% of the fee to Cole at the time that the first settlement was consummated. Several months later, plaintiff filed a motion pursuant to a circuit court rule in which the court was to determine the value of services rendered in personal injury and wrongful death actions. He sought to bar Cole from receiving any further fees. The trial court entered judgment on behalf of both attorneys for 25% of the settlements, enforcing the 50/50 distribution between them.

The appellate court reversed, holding that Cole was only entitled to *quantum meruit* because he breached his fiduciary duty to the plaintiff by failing to inform him of his fee-splitting contracts with Kotin and the prior attorney. *Kravis v. Smith Marine, Inc.* (1973), 15 Ill. App. 3d 494, 304 N.E.2d 720.

The Illinois Supreme Court reversed the appellate court and affirmed the circuit court, holding that Cole was entitled to the contractual fee. Noting that plaintiff's theory had radically changed on appeal, and that plaintiff had abandoned his trial contention that he did not have an attorney-client relationship with Cole, the court ruled that he could not change the issue on appeal and that the appellate court should not have considered the matter. Since the only issue was the existence of the attorney-client relationship, which was no longer disputed, the court refused to void the contract. Reviewing the written contract, the court noted that the plaintiff, a sophisticated and educated accountant, had signed it freely. The contract clearly revealed that both attorneys would receive the fee, although no specific division was indicated. The court also found that the plaintiff had in essence ratified the agreement by agreeing to the 50/50 split after the first settlement distribution. The court concluded, "While he may not have been aware of the exact division of the fee between Kotin and Cole, he knew it would be divided as the trial court concluded." *Kravis*, 60 Ill. 2d at 149-50, 324 N.E.2d at 421.

*Corti v. Fleisher* (1981), 93 Ill. App. 3d 517, 417 N.E.2d 764, which involved issues different from those in *Kravis*, is another pre-

Code case. Under an agreement between plaintiff and his former law firm, all files that plaintiff had indirectly referred to the firm, and the fees generated by them, would become his property upon termination from the firm. One of the partners of the firm, however, had received instructions from a client directing him to retain personal custody and control over the files.

The court held that the transfer of files without the clients' permission was improper and void, since the right of clients to choose their own attorneys is germane to the attorney-client relationship. As for the plaintiff's claim to fees generated by the files in issue, the court held he was not entitled to fees for work that he did not do. In fact, plaintiff's original source of the files was a disbarred attorney; plaintiff apparently never had a true attorney-client relationship with the clients. Hence, he was not even entitled to a referral fee.

None of these cases indicate that fee-sharing agreements are generally disfavored or improper. In fact, some courts have acknowledged that benefits may result to the client when two or more attorneys pool their expertise and resources in return for a shared fee. See *Disney v. Pritzker* (7th Cir. 1967), 385 F.2d 572; *In re Agent Orange Product Liability Litigation* (E.D.N.Y. 1985), 611 F. Supp. 1452, 1459.

To determine which agreements violate the canons of ethics, then, we must consider the underlying policy considerations and the harm to be avoided by the particular disciplinary rule.

■ Disciplinary Rule 2—107 aims to preserve the fiduciary relationship between a client and his attorney through *disclosure* of fee-sharing arrangements, thereby leading to greater accountability. In addition, the rule contains a *proportionality* concept, which can be viewed as protecting the client from unearned or excessive fees. Requiring a relationship between the fee claimed and services or responsibility assumed also ensures that the attorney will have the incentive to use his best efforts to resolve the case. See *Leoris v. Dicks* (1986), 150 Ill. App. 3d 350, 501 N.E.2d 901.

It is readily apparent that DR 2—107 mandates disclosure to the client whenever his attorney enters into an agreement with another attorney to share fees and responsibility for the legal matters entrusted to the first attorney. Hence, the client's right to be represented by the attorney of his choosing is preserved. No attorney whom the client has not retained will be entitled to payment from the client via a secret deal with the client's attorney. Instead, the client must consent in writing to the shared fee and shared responsibility.

Subsection (a)(2) further imposes proportionality of fees to ser-

vices performed and responsibilities assumed, unless the primary service is the referral of the client to another lawyer. In that case, the receiving lawyer must fully disclose that the referring lawyer has or will receive economic benefit and the extent and basis of the benefit.[5]

Subsection (a)(3) ensures that the total fee for the shared services does not exceed reasonable compensation for the services performed. Thus, the client should be protected from "double dipping."

■■ In the pending case, Phillips has alleged that he and Joyce agreed to jointly represent all of the clients and that they were so informed. Most of the original nine clients that had retained Phillips consented in writing by executing new contingent fee agreements and had forwarded money thereunder. Leaving aside the more complex question of notification to the entire class for the moment, we find that Phillips' pleadings adequately set out the nature and extent of the joint representation agreement and that such information was disclosed to the clients. Joyce's letter to the clients expressly disclosed that the parties' "combined efforts" would lead to "the swiftest and most economically satisfactory conclusion" and that the class members would be required to sign new fee agreements to further the "joint representation." Given its customary legal meaning, "jointly" denotes "[u]nitedly, combined or joined together in unity of interest or liability." Black's Law Dictionary 752 (5th ed. 1979).[6]

Joyce nevertheless contends that the notice given in this case—notice that *he* sent out—is insufficient under DR 2–107 because it does not explicitly disclose that the joint representation contemplates a 50/50 sharing of work or responsibility and fees. Apparently, he advocates the disclosure of every facet of the division of work and fees before a fee-sharing contract could be upheld under DR 2–107.

---

[5]This referral provision removes blanket prohibitions against "forwarding fees," which by their nature involve an economic benefit for little or no actual services performed beyond the referral. The court in *Carter v. Katz, Shandell, Katz & Erasmous* (1983), 465 N.Y.S.2d 991, 120 Misc. 2d 1009, cited ABA opinions that suggest that a "mere recommendation is not a sufficient basis for a forwarding fee," and that there must be some work or responsibility, even if it is merely correspondence. ABA Committee on Professional Ethics, Opinions Nos. 97, 153, cited in *Carter v. Katz, Shandell, Katz & Erasmous* (1983), 465 N.Y.S.2d 991, 997, 120 Misc. 2d 1009, 1015.

DR 2–107(a)(2) requires the referring attorney to assume legal responsibility for the case as if he were a *partner* of the receiving attorney.

[6]Absent an express agreement as to fee division, cooperating attorneys are presumed to intend an equal division. (See, *e.g.*, cases collected in Annotation, Division of Fees or Compensation Between Co-operating Attorneys, 73 A.L.R.2d 991 (1960).) Since Phillips alleges an express agreement for a 50/50 split there is, of course, no need to imply such a division.

■ We believe, however, that a standard of substantial compliance is preferable because it comports with practical realities. In fact, such a standard is consonant with the Illinois Supreme Court's opinion in *Kravis v. Smith Marine, Inc.* and other cases that have considered the scope of the disclosure requirement. One court, faced with a similar question involving the disclosure of a fee-sharing agreement to a client, found that the client presumably knew of the arrangement, if not the details, stating, "This method of dealing admittedly may not strictly comport with the guidelines of section DR 2—107 of the Code of Professional Responsibility, but it certainly does not fall far from this section's ethical parameters." *Carter v. Katz, Shandell, Katz and Erasmous* (1983), 465 N.Y.S.2d 991, 997, 120 Misc. 2d 1009, 1015 (construing ABA version of the disciplinary rule).

POST-CODE CASES

Despite a paucity of decisions that have squarely addressed the scope of DR 2—107, one that does reversed a summary judgment that was entered against an attorney who claimed a portion of a fee under an alleged fee-sharing agreement. In *Schniederjon v. Krupa* (1985), 130 Ill. App. 3d 656, 474 N.E.2d 805 (*Schniederjon* I), the pre-Code version of DR 2—107 was applicable law but the court did consider the policy embodied in DR 2—107(A). The plaintiff attorney referred a client in a malpractice matter to defendant law firm after investigating the facts. He claimed that he informed the client that he would employ another attorney on a split-fee basis. The client denied this and claimed that she had hired defendants only.

Defendant attorneys did not dispute the existence of the contract to divide fees with the plaintiff; however, they argued that the contract was void as against public policy when made. The Fifth District Appellate Court reversed the trial court's grant of summary judgment in favor of defendants, holding that "[n]o ethical or legal problem *** arises when an attorney who seeks his share of the fee contributed some work, labor or service toward earning the fee." (130 Ill. App. 3d at 661, 474 N.E.2d at 809, citing *Oberman v. Reilly* (1978), 66 A.D.2d 686, 687, 411 N.Y.S.2d 23, 25.) The court found evidence that plaintiff had performed some work on the case. The court further found that there was a genuine question of material fact as to the client's knowledge of the 50/50 split-fee agreement.

After a trial upon remand, the trial court entered judgment in favor of the plaintiff attorney. On appeal, however, the court reversed, holding that the trial court's finding that the fee-sharing agreement

was disclosed to the client was against the manifest weight of the evidence. *Schniederjon v. Krupa* (1987), 162 Ill. App. 3d 192, 514 N.E.2d 1200 (one judge dissenting) (*Schniederjon* II).

*Schniederjon* I recognized that public policy favors freedom to contract and that the court "will not declare a contract illegal unless it expressly contravenes the law or a known public policy of this State." (*Schniederjon*, 130 Ill. App. 3d at 659, 474 N.E.2d 805, 808.) This court distinguished *Corti v. Fleisher* (1981), 93 Ill. App. 3d 517, 417 N.E.2d 764, as being a referral case in which no services were performed by the plaintiff and no disclosure was made to the clients concerning the agreement between the attorneys.

In the case before us, defendants seek to distinguish *Schniederjon* I by asserting that the court found the agreement enforceable because of a full disclosure to the client, including the basis of the representation. The court did not so find, but allowed plaintiff to proceed to trial to prove his allegations.

■ We agree with *Schniederjon* I that contracts for the sharing of services and fees are not *per se* violative of the Code, any more than such agreements were considered void in the pre-Code cases.[7]

Defendants' reliance on *Corti v. Fleisher* (1981), 93 Ill. App. 3d 517, 417 N.E.2d 764, and *Hofreiter v. Leigh* (1984), 124 Ill. App. 3d 1052, 465 N.E.2d 110, is misplaced. As our prior analysis indicates, the *Corti v. Fleisher* court was primarily concerned with the lack of an attorney-client relationship between the plaintiff, who had been discharged from the law firm, and the clients, plus the fact that he claimed fees generated from the files after his termination, fees that obviously would be unearned in any sense of the word. In contrast, Phillips alleges an attorney-client relationship with the clients that he brought to Joyce, actual services performed, and written disclosure to the clients of the joint representation.

*Hofreiter v. Leigh* involved the propriety of allowing an attorney to claim fees based on a contingent fee-sharing agreement *after the client discharged him.* Quite apart from the disciplinary rules, attorneys do not have an automatic right to the contractual fee after dis-

---

[7]The notion that most of all fee-splitting agreements are inherently questionable probably arose in the context of the personal injury "chaser" cases, in which an attorney often employed nonattorneys to solicit business on his behalf, in return for a share of the fee. See *In re Cohn* (1956), 10 Ill. 2d 186, 193-94, 139 N.E.2d 301, 305 (Bristow, J., specially concurring on consideration of petition for rehearing), in which it was noted, "The more aggravated cases of solicitation that appear in our reports invariably involve fee splitting, the procurer receiving a substantial percentage of the recovery." See also *In re Heirich* (1956), 10 Ill. 2d 357, 140 N.E.2d 825.

charge. Rather, they may recover on a *quantum meruit* basis, payment for services rendered to that point. See *Rhoades v. Norfolk & Western Ry. Co.* (1979), 78 Ill. 2d 217, 399 N.E.2d 969. *Cf. Leoris v. Dicks* (1986), 150 Ill. App. 3d 350, 501 N.E.2d 509 (a fee-splitting agreement between a discharged attorney and successor attorney, found to be void, does not give discharged attorney a right to *quantum meruit* recovery from other attorney because parties are in *pari delicto* and court will leave them where they are).

We find nothing in any of the cases to persuade us to hold that the alleged agreement fails to state a cause of action for breach of contract. The clients on whose behalf Phillips filed the State court action retained Phillips, not Joyce, in the first instance.[8] They executed new fee agreements consenting to the joint representation of Phillips and Joyce, presumably based upon the representations that the attorneys' combined efforts would be beneficial to them. The clients were assured that the total, or combined, fee charged by the two firms would not exceed one-third recovery of any settlement or judgment. Phillips and Joyce would work together, with a basic division of pretrial and trial work.

In such an arrangement it seems reasonable to conclude that the parties considered themselves as partners in the venture, to share equally in the fees, because they are contributed or agreed to contribute something of value to the "partnership." The parties themselves made a business judgment, presumably, as to the relative value of each other's contribution, which could include such intangibles as client loyalty and legal expertise as well as actual hours of work. (See *In re Agent Orange Product Liability Litigation* (E.D.N.Y. 1985), 611 F. Supp. 1452, 1461 ("[L]aw is a business and within limits of public policy such as those set by professional ethics and the usury laws, lawyers may make their own business arrangements as do other business people").) Consequently, we find that Phillips' pleadings adequately state a cause of action.

RELATED CONCERNS

Notwithstanding our holding, we are impelled to comment on some factors that may complicate the resolution of this case.

First, there is the question of what disclosure or notice of the fee agreement was necessary to the unnamed class members and whose

---

[8]In fact, a letter in the record indicates that one of Phillips' clients, after receiving Joyce's letter proposal, reaffirmed that he desired Phillips, "in conjunction with Joyce and Kubasiak," to represent him.

responsibility it was to send it. At least one court has noted the impracticalities of notifying hundreds of class members of an internal fee-sharing agreement among counsel who managed complex litigation. *In re Agent Orange Product Liability Litigation* (E.D.N.Y. 1985), 611 F. Supp. 1452, 1463.

In *Agent Orange*, the Federal Court for the Eastern District of New York noted that class attorneys have fiduciary obligations to the class but recognized the absence of a personal relationship between most class members and the attorneys. Accordingly, the court commented that the existence of fee-sharing agreements should be disclosed to the court early in the litigation so the court could best protect the interests of the class. (611 F. Supp. at 1462-63.) The court went on to question "[w]hether the expense of a separate notification to members of the class is warranted," stating that such an issue "will be a matter for the court to consider in connection with each case's needs. Here the size of the class would have made a separate notification inappropriate. *** When notice was ultimately given to the class the fee arrangement notification could have been incorporated in the communication to the class." 611 F. Supp. at 1463.

Notably, the court did not invalidate the fee-sharing agreement before it but ruled that in all future cases in the Eastern District of New York the court must be informed of all fee-sharing agreements at the outset.

We have no way of knowing what the Federal Court for the Northern District of Illinois would have done had the Phillips-Joyce fee-sharing agreement been presented to it at the beginning of litigation or even at the end. Among the options, as Joyce notes, was the possibility that the court would not have appointed Joyce as lead counsel in the first place. Or, the court could have treated Phillips as a member of Joyce's law firm for purposes of the fee allocation and left the two of them to determine how to divide the joint fee, as long as there was substantiation that both performed services, jointly, for the class. The court could have enforced it as written.[9] We simply do not know.

---

[9]It is not inconceivable that the Federal court would have taken the disputed portion of the fee and refunded it to the clients, a result that we assume neither party desires. In *Lewis v. Teleprompter Corp.* (S.D.N.Y. 1980), 88 F.R.D. 11, when the court discovered that the lead counsel for the class and other attorneys had entered into a fee-sharing agreement without informing the court, it stated, "We deal here with class members' money. To the extent that a part of a fee award goes to an attorney who has rendered no service, to that extent the fee award is too high and is unreasonable." 88 F.R.D. at 17.

Another concern is the proportionality requirement of DR 2—107. Viewed one way, Phillips should not recover fees for the hours of work Joyce performed. Viewed another, Phillips brought clients to Joyce because of Joyce's proposal, let the matter proceed in the Federal court and forebore from pursuing the parallel State court action. Moreover, he presumably stood ready, willing, and able to perform services that Joyce prevented him from doing. Furthermore, at the time the parties entered the contract, they had purportedly divided the responsibility for the case in a reasonable manner, with Joyce to handle pretrial matters and Phillips to handle the actual trial. In any event, it appears that more than a referral fee was contemplated.

We do not express an opinion on these concerns, however, because the facts necessary to resolve them are not yet developed. Joyce has not filed an answer. There may be other affirmative defenses, since the legal and factual issues have not been defined beyond the face of the complaint.

We also question Joyce's attempt to use the disciplinary rules to avoid his alleged contractual obligations. Whether he may be estopped from doing so is an issue we need not decide on this appeal.

On the one hand, if a contract is declared void for contravening a law or public policy, the courts leave the parties to the contract where they find them, regardless of "whose ox is gored." (*Schniederjon v. Krupa* (1987), 162 Ill. App. 3d 192, 195, 514 N.E.2d 1200, 1202.) On the other hand, "Disciplinary Rule 2—107 should not be too readily construed as a license for attorneys to break a promise, go back on their word, or decline to fulfill an obligation, in the name of legal ethics." *Baron v. Mullinax, Wells, Mauzy & Baab, Inc.* (Tex. App. 1981), 623 S.W.2d 457, 462.[10]

Since the trial court apparently determined that the alleged agreement was void *per se*, it has not considered any of these issues. We accordingly reverse the judgment of the trial court dismissing the

---

[10]While we are aware of the rule that a party who is *in pari delicto* with another cannot rely on an estoppel theory to prevent the assertion of the illegality defense (*O'Hare v. Ahlgren, Blumenfeld, & Kempster* (1987), 158 Ill. App. 3d 562, 511 N.E.2d 879), we are not in favor of an attorney's unfettered use of an illegality defense. The availability of such a shield may foster even greater ills than the void transaction itself. (See Justice Pincham's dissent from *O'Hara v. Alhgren, Blumenfeld, & Kempster* (1987), 158 Ill. App. 3d 562, 566, 511 N.E.2d 879, 882.) If an attorney uses his own illegal conduct as an excuse for breaching his contract, he not only violates a disciplinary rule (for which separate sanctions may be imposed in the appropriate forum) but he also commits a second wrong, dishonoring his contractual promise.

complaint, hold that Phillips has pleaded a cause of action, and remand for further proceedings.

Reversed and remanded.

JOHNSON and McMORROW, JJ., concur.