**Richard A. DAYNARD, Plaintiff,**

v.

**NESS, MOTLEY, LOADHOLT, RICHARDSON & POOLE, P.A.; Ronald Motley; Scruggs, Milette, Bozeman & Dent, P.A.; and Richard F. Scruggs, Defendants.**

**CIV.A.No. 01–10099–WGY.**

United States District Court, D. Massachusetts.

Dec. 3, 2001.

Edward J. Barshak, Sugarman, Rogers, Barshak & Cohen, Boston, MA, for plaintiff.

Michael E. Mone, Esdaile, Barrett & Esdaile, Boston, MA, Mark A. Pogue, Edwards & Angell, LLP, Providence, RI, for defendants.

*MEMORANDUM*

YOUNG, Chief Judge.

Several years ago the tobacco industry settled numerous lawsuits, thus producing enormous attorneys' fees for the lawyers involved. Confirming the adage that "victory has a thousand fathers," a professor of law in Massachusetts, licensed to practice law in New York, now wants to enforce an oral fee-splitting agreement allegedly formed in Illinois with lawyers from South Carolina and Mississippi who profited from the tobacco settlement. This memorandum considers three issues: (i) the effect of an alleged release, (ii) what law governs this dispute, and (iii) the extent to which the rules of professional conduct permit lawyers to avoid their own oral fee-splitting agreements.

## I. INTRODUCTION

The plaintiff, Professor Richard A. Daynard ("Daynard") of Northeastern University School of Law, has spent much of his academic career studying how to defeat the tobacco industry in court. Compl. ¶¶ 21–29. The defendants—the Ness law firm and one of its partners, Mr. Motley (together "the South Carolina defendants"), and the Scruggs law firm and one of its partners, Mr. Scruggs (together "the Mississippi defendants")—were among the many law firms representing state governments in the titanic battle against the tobacco industry ("the State Tobacco Litigation"). *Id.* ¶¶ 15–19.

Between 1993 and 1997, Daynard provided advice to the defendants. Daynard Aff. ¶¶ 1–2. No written contract detailed how Daynard would be compensated, but Daynard alleges that he and one of the Mississippi defendants shook hands in Chicago, Illinois in 1996 on an agreement whereby he would receive 5% of any attor-

neys' fees paid to the defendants as a result of the State Tobacco Litigation. *Id.* ¶ 4. In 1997 and 1998, the tobacco industry agreed to settle the State Tobacco Litigation for billions of dollars. Since then, the defendants have received millions of dollars in attorneys' fees and Daynard has received nothing. Answer ¶¶ 65–66.

Daynard filed a complaint in state court, which the defendants properly removed to this Court. 28 U.S.C. §§ 1332(a)(1), 1441(a). The complaint seeks, among other things, enforcement of the oral fee-splitting agreement or, in the alternative, recovery on a quantum meruit basis. The Mississippi defendants contested personal jurisdiction and did not answer the complaint. After extensive briefing, jurisdictional discovery, and two hearings, this Court dismissed the Mississippi defendants for want of personal jurisdiction and immediately entered partial judgment in their favor, Fed.R.Civ.P. 54(b). The South Carolina defendants consented to personal jurisdiction, answered the complaint, and promptly sought summary judgment, Fed. R.Civ.P. 56(b). This memorandum addresses the South Carolina defendants' motion for summary judgment.

## II. DISCUSSION

Rather than engage Daynard's complaint on the facts, the South Carolina defendants instead based their motion on three purely legal defenses: (i) Daynard agreed to release the defendants from all liability, (ii) the alleged oral agreement is unenforceable because it would violate the rule of professional conduct that prevents the division of fees among attorneys except with the consent of the client, and (iii) quantum meruit is not available for unen-

forceable contracts. The first and third arguments do not withstand scrutiny, but the second argument raises difficult questions that the parties need to explore further, an exploration the Court ordered at a hearing on September 13, 2001. The following discussion addresses the arguments in order of complexity.

### A. The Release

Eleven months before Daynard filed his complaint, a certain Wendell Gauthier signed a "Mutual Release" on behalf of a certain Castano Plaintiffs' Legal Committee ("Castano Committee"), of which Daynard is identified as a member. Motley Aff. Ex. D. The words of the release are as clear as they are broad: the Castano Committee "and each and every law firm and lawyer now or formerly comprising part of it" released the South Carolina and Mississippi defendants from "any and all claims … that may arise out of or relate in anyway to (i) [the South Carolina and Mississippi defendants'] association, membership and relationship whatsoever with the [Castano Committee] and (ii) any claim for fees or reimbursements of costs paid to or to be paid to [the South Carolina and Mississippi defendants] by virtue of fee arbitrations and liquidations pursuant to the [State Tobacco Litigation settlement] or Previously Settled States which have occurred or occurs in the future." *Id.* at 3–4.[1]

As matter of law, a clear and unambiguous contract must be enforced according to its terms. As matter of fact, however, this broadly-worded release apparently applied only to the relationship between the Castano Committee and the South Carolina and Mississippi defendants, not the individual

---

1. The South Carolina defendants point out that a previous draft of the agreement limited the release quoted above to "work done or expenses incurred by such claiming party while a member of the [Castano Committee]," but the final draft omitted this limitation. Defs.' Supplemental Mem. at 2.

relationships that might have formed outside the context of the Castano Committee. The dispute giving rise to the release apparently was a case in San Diego, California named *Ellis v. R.J. Reynolds Tobacco Co.*, No. 706458 (Cal.Super. Ct. filed July 24, 1996). The South Carolina defendants give no reason to believe that Daynard's complaint, which is based on his individual work for the South Carolina and Mississippi defendants dating back to 1993, has any relationship to *Ellis* in particular or the Castano Committee in general. Accordingly, the South Carolina defendants give no reason to believe that the broadly-worded release, when read in context, has any bearing on the dispute before this Court.

Daynard concedes the release absolves the South Carolina and Mississippi defendants from *some* liability; he simply contends that the release does not pertain to his *individual* claim. Daynard's affidavit is clear on this point:

> I never authorized Mr. Gauthier to release my *individual* claim against the defendants for which the present suit is brought. I never had any discussion with Mr. Gauthier, or anyone else in the Castano [Committee] about releasing such a claim or authorizing Mr. Gauthier to do so .... The disputes between the defendants and the Castano [Committee] ... could not have involved my present claim against the defendants since my claim is based upon an agreement and relationship between me and the defendants which is and was separate from the functions of the Castano [Committee].

Daynard Aff. ¶ 9 (emphasis added).

The Court suspects the release is a red herring, but that determination can wait for another day. For now, it will suffice to say that a genuine issue of material fact precludes judgment as matter of law. Fed.R.Civ.P. 56(c).

## B. The Rules of Professional Conduct

Seizing upon the bar's traditional hostility toward the division of attorneys' fees, the South Carolina defendants argue that this Court should refuse to enforce the alleged oral fee-splitting agreement as matter of public policy and should refuse to allow recovery even on a quantum meruit basis.

### 1. Quantum Meruit

■ Even if the South Carolina defendants are correct that the alleged oral fee-splitting agreement is unenforceable as matter of public policy, they overreach in arguing that the Court should refuse to allow recovery even on a quantum meruit basis.

As discussed more fully below, *see infra* p. 10, any one of five different jurisdictions—New York, Massachusetts, Illinois, Mississippi, and South Carolina—might supply the governing law for this case. The choice-of-law question is not important at the moment, however, because the five jurisdictions are in harmony on the issue of quantum meruit. Although the South Carolina defendants are correct that equity should not enforce an illegal contract, the South Carolina defendants fail to distinguish between (i) a contract which, if carried out, would violate a strong public policy and (ii) a merely unenforceable contract. A contract for murder—or, in the case cited by the South Carolina defendants, a promise by a man to support a woman if she divorced her husband, *Capazzoli v. Holzwasser*, 397 Mass. 158, 160, 490 N.E.2d 420 (1986)—cannot be enforced at law or equity because performance of the agreement is repugnant to public policy. The contract alleged by Daynard, on the other hand, is perfectly benign and certainly *could* be enforced at law. A fee-

splitting agreement violates no public policy *per se.*

"[S]hould a fee contract be unenforceable a lawyer can obtain quantum meruit recovery ... unless the lawyer's conduct warrants fee forfeiture...." Restatement (Third) of the Law Governing Lawyers § 39 cmt. e (2000). Fee forfeiture is warranted only in the case of a "clear and serious" violation of the rules of professional conduct. *Id.* § 37. New York and Illinois have specifically allowed recovery on a quantum meruit basis in Daynard's situation,[2] and Massachusetts, Mississippi, and South Carolina have all allowed recovery on a quantum meruit basis in similar situations.[3] Accordingly, Daynard may recover on a quantum meruit basis even if the alleged oral fee-splitting agreement is unenforceable as matter of public policy.

## 2. Imperfect Fee–Splitting Agreements

The real question is whether the alleged agreement is enforceable. The South Carolina defendants present a deceptively simple argument against enforcement: the oral agreement was made in Illinois, so Illinois law governs, but the Illinois Rules of Professional Conduct prevent enforcement of the agreement as matter of public

---

**2.** *Ford v. Albany Med. Ctr.,* 283 A.D.2d 843, 724 N.Y.S.2d 795, 798 (N.Y.App.Div.2001); *Anderson v. Anchor Org., for Health Maint.,* 274 Ill.App.3d 1001, 211 Ill.Dec. 213, 654 N.E.2d 675, 681 (1995).

None of the states that have held a fee-splitting agreement unenforceable has also prohibited recovery on a quantum meruit basis. To the contrary, Alaska, California, Illinois, Louisiana, New Hampshire, and New York have specifically allowed recovery on a quantum meruit basis after refusing to enforce a fee-splitting agreement. *In re Estate of Katchatag,* 907 P.2d 458, 464 (Alaska 1995); *Chambers v. Kay,* 106 Cal.Rptr.2d 702, 717–19 (Cal.App.2001), *review granted,* 109 Cal.Rptr.2d 301, 26 P.3d 1039 (Cal.2001); *Bertucci v. McIntire,* 693 So.2d 7, 9 (La.Ct. App.1997); *Kalled v. Albee,* 142 N.H. 747, 712 A.2d 616, 618 (1998). *See generally* R.A. Horton, Annotation, *Attorney's Recovery in Quantum Meruit for Legal Services Rendered Under a Contract Which Is Illegal or Void as Against Public Policy,* 100 A.L.R.2d 1378 (1965 & Supp.2000) ("[A]lthough there may be no recovery on the contract itself, recovery in quantum meruit nevertheless is ordinarily permissible ... if the services themselves are not intrinsically illegal, or the conduct surrounding execution of the contract violates no overriding public interest, and the services are of a compensable nature.").

Some courts in Illinois have barred recovery on a quantum meruit basis after refusing to enforce a fee agreement, but those cases "are distinguishable because in those cases it was prohibited for the attorneys to enter into the agreements at issue; the fee agreements themselves violated public policy." *Much Shelist Freed Denenberg & Ament, P.C. v. Lison,* 297 Ill.App.3d 375, 231 Ill.Dec. 625, 696 N.E.2d 1196, 1201 (1998) (distinguishing, inter alia, *Leoris v. Dicks,* 150 Ill.App.3d 350, 103 Ill.Dec. 584, 501 N.E.2d 901, 904 (1986)).

**3.** *See Guenard v. Burke,* 387 Mass. 802, 806–08, 443 N.E.2d 892 (1982) (allowing recovery on quantum meruit basis for services performed pursuant to unenforceable contingency fee agreement); *Bloomenthal v. Halstrom,* No. 951773B, 1999 WL 1318980, at \*6 (Mass.Super.Ct. Mar. 16, 1999) (Burnes, J.) (denying, after considering, recovery on quantum meruit basis because referring attorney did no work beyond making single phone call); *In re Estate of Stewart,* 732 So.2d 255, 259 (Miss.1999) (allowing recovery on quantum meruit basis for services performed pursuant to unenforceable oral contingency fee agreement); *Joye v. Heuer,* 813 F.Supp. 1171, 1173–74 (D.S.C.1993) (allowing South Carolina attorneys either to enforce imperfect fee-splitting agreement governed by California law or to recover on quantum meruit basis in amount determined by California law), *aff'd,* 66 F.3d 316, 1995 WL 552028 (4th Cir.1995); *Weatherford v. Price,* 340 S.C. 572, 532 S.E.2d 310, 315 (2000) (allowing recovery on quantum meruit basis for services performed in absence of written fee agreement: "[O]ur supreme court has not ruled that a fee agreement which violates [Rule 1.5] is unenforceable in all circumstances as against public policy.").

policy because no client consented to the agreement in writing, so Daynard loses. This simple argument belies the factual and legal complexities involved.

The South Carolina defendants correctly recite the law of Illinois, which is quite clear, but they provide less guidance on why Illinois law should apply or what the law in other jurisdictions would be. Furthermore, they overlook the factual differences between this case and the relevant published decisions. First, in most cases all the events took place in a single state and involved attorneys governed by the same rules of professional conduct. In this case, many states and many different rules of professional conduct are involved. Second, in most cases the attorneys were paid out of the money paid to the client, thus creating a tension between the attorney and the client over how to divide the award. In this case, the settlement agreement itself divided the award between the clients and the attorneys, leaving it up to an arbitration panel to distribute the money among the attorneys. Daynard Aff. ¶ 6. Thus, the clients in this case may no longer have any particular interest in how their attorneys are paid.

In short, the South Carolina defendants present nothing more than a paper tiger when they point to the Illinois Rules of Professional Conduct. That much is clear. What is not clear is how to answer all the ethical questions raised by the South Car-olina defendants. In particular, what role do the relevant rules of professional conduct have in a contract dispute among lawyers, and more importantly, what state's law governs interpretation and enforcement of the alleged contract?

### a. The Five Relevant Jurisdictions

As stated before, any one of five different jurisdictions—New York, Massachusetts, Illinois, Mississippi, and South Carolina—might supply the law governing the alleged oral agreement between the parties. Daynard is licensed by New York and resides in Massachusetts, Compl. ¶¶ 14, 21, the oral agreement allegedly was made in Illinois, Daynard Aff. ¶ 4, and the defendants are from South Carolina and Mississippi, Compl. ¶¶ 15–16, 18–19. Today Massachusetts, Illinois, Mississippi, and South Carolina generally follow the Model Rules of Professional Conduct ("Model Rules"), while New York generally follows the Model Code of Professional Responsibility ("Model Code"); until December 31, 1997—the year the defendants repudiated the alleged oral fee-splitting agreement—Massachusetts also followed the Model Code.[4]

Both the Model Rules and the Model Code permit a division of fees that is in proportion to the service performed by each lawyer. Model Rules of Prof'l Conduct R. 1.5 (1983);[5] Model Code of Prof'l

---

4. *See* Mass. S.J.C. Rule 3:07, 426 Mass. 1301, 1302–1434 (effective Jan. 1, 1998); Ill. Sup. Ct. R. art. VIII, 134 Ill.2d 470–507 (effective Aug. 1, 1990); Miss. R. Ct., Rules of Prof'l Conduct (effective July 1, 1987), *available at Mississippi Rules of Court, State and Federal* 337–84 (West 2001); S.C.App.Ct. R. 407 (effective Sept. 1, 1990); N.Y. Comp.Codes R. & Regs. tit. 22, pt. 1200 (effective Sept. 1, 1990).

5. The Model Rules of Professional Conduct provide:

A division of a fee between lawyers who are not in the same firm may be made only if:

(1) the division is in proportion to the service performed by each lawyer or, by written agreement with the client, each lawyer assumes joint responsibility for the representation;

(2) the client is advised of and does not object to the participation of all the lawyers involved; and

(3) the total fee is reasonable.

Model Rules of Prof'l Conduct R. 1.5(e).

Responsibility DR 2–107(A) (1980).[6] Jurisdictions differ, however, on the extent to which the client must consent to the fee division. In this case the alleged division of fees between Daynard and the defendants likely was in proportion to the service performed by each lawyer, so the key question is client consent.

The five relevant jurisdictions address the question of client consent in three different ways. In Mississippi and South Carolina, which both directly follow Model Rule 1.5, a division of fees is prohibited unless the client is *advised and does not object* to the participation of all the lawyers involved. In New York [7] and in Massachusetts,[8] under both its version of Rule 1.5 and DR 2–107(A), the client must affirmatively *consent*. In Illinois, the client must *consent in writing*.[9] To recapitulate:

6. The Model Code of Professional Responsibility provides:

> A lawyer shall not divide a fee for legal services with another lawyer who is not a partner in or associate of his law firm or law office, unless:
> (1) The client consents to employment of the other lawyer after a full disclosure that a division of fees will be made.
> (2) The division is made in proportion to the services performed and responsibility assumed by each.
> (3) The total fee of the lawyers does not clearly exceed reasonable compensation for all legal services they rendered the client.

Model Code of Prof'l Responsibility DR 2–107(A).

7. According to the New York Code of Professional Responsibility:

> A lawyer shall not divide a fee for legal services with another lawyer who is not a partner in or associate of the lawyer's law firm, unless:
> (1) The client consents to employment of the other lawyer after a full disclosure that a division of fees will be made.
> (2) The division is in proportion to the services performed by each lawyer or, by a writing given the client, each lawyer assumes joint responsibility for the representation.
> (3) The total fee of the lawyers does not exceed reasonable compensation for all legal services they rendered the client.

N.Y.Code of Prof'l Responsibility DR 2–107(A), N.Y. Comp.Codes R. & Regs. tit. 22, § 1200.12 (1995 & Supp.2001). Before June 30, 1999, the first sentence included the words "or law office" before the word "unless."

8. According to the Massachusetts Rules of Professional Conduct:

> A division of a fee between lawyers who are not in the same firm may be made only if, after informing the client that a division of fees will be made, the client consents to the joint participation and the total fee is reasonable. This limitation does not prohibit payment to a former partner or associate pursuant to a separation or retirement agreement.

Mass. Rules of Prof'l Conduct R. 1.5(e).

According to the Massachusetts Code of Professional Responsibility, which was superseded effective January 1, 1998:

> A lawyer shall not divide a fee for legal services with another lawyer who is not a partner in or associate of his law firm or law office, unless:
> (1) The client consents to employment of the other lawyer after a full disclosure that a division of fees will be made.
> . . . .
> (3) The total fee of the lawyers does not exceed reasonable compensation for all legal services they rendered the client.

Mass.Code of Prof'l Responsibility DR 2–107(A), 359 Mass. 787, 808 (effective Oct. 2, 1972).

9. According to the Illinois Rules of Professional Conduct:

> (f) Except as provided in Rule 1.5(j), a lawyer shall not divide a fee for legal services with another lawyer who is not in the same firm, unless the client consents to employment of the other lawyer by signing a writing which discloses:
> (1) that a division of fees will be made;
> (2) the basis upon which the division will be made, including the economic benefit to be received by the other lawyer as a result of the division; and
> (3) the responsibility to be assumed by the other lawyer for performance of the legal services in question.

in Mississippi and South Carolina the client must be advised and not object, in New York and Massachusetts the client must consent, and in Illinois the client must consent in writing.

Courts in Illinois, unlike courts in the other four jurisdictions, have clearly held in numerous decisions that an agreement to divide fees will not be enforced unless the agreement complies with the rules of professional conduct. In other words, if the client does not consent in writing, the agreement is unenforceable. *E.g., Holstein v. Grossman*, 246 Ill.App.3d 719, 186 Ill.Dec. 592, 616 N.E.2d 1224, 1229–36 (1993) (refusing to enforce oral fee-splitting agreement), *quoted with approval in Kaplan v. Pavalon & Gifford*, 12 F.3d 87, 91–92 (7th Cir.1993) (same). The rationale of these decisions is simple: the rule governing the division of fees is considered "public policy" and courts should not enforce an agreement that violates public policy. Courts in Illinois have been strict on this issue: not even estoppel—for example, a showing that one attorney and not the other was at fault for failing to secure written consent from the client—can overcome "public policy."[10] " 'It does not matter whose ox is gored.' We will not enforce a fee-sharing agreement which

violates public policy." *Id.* at 731, 186 Ill.Dec. at 604, 616 N.E.2d at 1236 (citation omitted).

Courts in New York appear to disagree with the courts in Illinois. In *Benjamin v. Koeppel*, 85 N.Y.2d 549, 626 N.Y.S.2d 982, 650 N.E.2d 829 (1995), an attorney referred a client to a law firm in exchange for one-third of any fees the law firm earned. After the law firm successfully completed the legal matter for the client, the attorney asked for his fee. The law firm refused to pay for two reasons: (i) the attorney had not kept his bar registration in New York up to date and (ii) the agreement was in violation of the code of professional responsibility because the division was not in proportion to the service performed by each lawyer. The court rejected both arguments and noted that "courts are especially skeptical of efforts by clients or customers to use public policy 'as a sword for personal gain rather than a shield for the public good.' " *Id.* at 553, 626 N.Y.S.2d at 984, 650 N.E.2d at 831. With respect to the first argument, the court agreed that the attorney's failure to register violated public policy and could subject him to disciplinary proceedings, but the court concluded that "precluding plaintiff from recovering on his contract

(g) A division of fees shall be made in proportion to the services performed and responsibility assumed by each lawyer, except where the primary service performed by one lawyer is the referral of the client to another lawyer and

(1) the receiving lawyer discloses that the referring lawyer has received or will receive economic benefit from the referral and the extent and basis of such economic benefit, and

(2) the referring lawyer agrees to assume the same legal responsibility for the performance of the services in question as would a partner of the receiving lawyer.

(h) The total fee of the lawyers shall be reasonable.

. . . .

(j) Notwithstanding Rule 1.5(f), a payment may be made to a lawyer formerly in the firm, pursuant to a separation or retirement agreement.

Ill. Rules of Prof'l Conduct R. 1.5.

**10.** "Substantial compliance" with the rules, however, might suffice. *Compare Holstein*, 186 Ill.Dec. 592, 616 N.E.2d at 1235 ("Absent ... written consent, there can be no substantial compliance."), *with Davies v. Grauer*, 291 Ill.App.3d 863, 225 Ill.Dec. 933, 684 N.E.2d 924, 927–29 (1997) (allowing oral consent), *and Phillips v. Joyce*, 169 Ill.App.3d 520, 120 Ill.Dec. 22, 523 N.E.2d 933, 939 (1988) (allowing written, but not fully informed, consent).

with defendants is a remedy that is 'wholly out of proportion to the requirements of public policy.'" *Id.* at 556, 626 N.Y.S.2d at 985, 650 N.E.2d at 832 (citation omitted). With respect to the second argument, the court held that the agreement did not violate the code of professional responsibility:

> It has long been understood that in disputes among attorneys over the enforcement of fee-sharing agreements the courts will not inquire into the precise worth of the services performed by the parties as long as each party actually contributed to the legal work and there is no claim that either "refused to contribute more substantially." Moreover, it ill becomes defendants, who are also bound by the Code of Professional Responsibility, to seek to avoid on "ethical" grounds the obligations of an agreement to which they freely assented and from which they reaped the benefits (ABA Comm. on Professional Ethics, Informal Opn No. 870).

*Id.* at 556, 626 N.Y.S.2d at 985, 650 N.E.2d at 832–33 (citations omitted).[11] The ABA opinion cited by the court states:

> [A lawyer referred a client to another lawyer, not in the same firm, in exchange for one-third of the fees earned. The referring lawyer had done very little work on the case. At the time, Rule No. 34 of the Canons of Professional Ethics of the American Bar Association provided that fees should only be divided in proportion to the services performed. The client, but apparently not the lawyers, objected to payment of the referral fee.]

When the late Henry S. Drinker, a former chairman of this Committee [on Professional Ethics], wrote his authoritative work *Legal Ethics,* he devoted an entire section of his book to the subject "The Lawyer's Obligations and Relations to Other Lawyers." The following are quotations from that work:

" .... As far as possible, important agreements, affecting the rights of clients, should be reduced to writing; but it is dishonorable to avoid performance of an agreement fairly made because it is not reduced to writing, as required by rules of Court." (page 194)

"A very great part of a man's comfort, as well as of his success at the Bar, depends upon his relations with his professional brethren. With them he is in daily necessary intercourse, and he must have their respect and confidence, if he wishes to sail along in smooth waters ...." (page 194)

"A lawyer may not repudiate an oral stipulation, made in return for a favor granted, which cannot be revoked, to admit a certain fact in issue, which at the time could have been proved but now can be, if at all, only with difficulty; this despite his client's insistence and the existence of a court rule making oral stipulations unenforceable."

....

It is the decision of the Committee that the attorney should not interpose as a reason for not carrying out the agreement he made that the agreement was not ethical. This matter of ethics should have been recognized and adhered to by the attorneys before they entered into

---

11. A later case by a lower court reached a contrary result, but that case failed to cite *Benjamin* or any more recent authority. In *Ford v. Albany Medical Center*, 283 A.D.2d 843, 724 N.Y.S.2d 795 (N.Y.App.Div.2001), the court held that an agreement similar to the agreement in *Benjamin* violated the code of professional responsibility, apparently because the referring attorney only performed 3% of the work. Accordingly, the court held that the agreement was unenforceable and that the referring attorney could only recover 3% of the fees on a quantum meruit basis. *Id.* at 798.

the agreement. When two lawyers have participated in an unethical agreement one of them should not, where no one else is involved, set up the unethical agreement against the other.

ABA Comm. on Prof'l Ethics, Informal Op. 870 (1965); *cf. John* 8:7 (King James) ("He that is without sin among you, let him first cast a stone . . . .").

Courts in Massachusetts, Mississippi, and South Carolina have not specifically addressed the relationship between contract law and the rules of professional conduct. There have been court opinions in those states *disciplining* a lawyer for, among other things, failing to comply with the rule concerning the division of fees, but no court in those states has addressed whether a fee agreement that does not comply strictly with the rules of professional conduct is enforceable. *E.g., In re Kerlinsky,* 406 Mass. 67, 74, 546 N.E.2d 150 (1989);[12] *Attorney U v. Miss. Bar,* 678 So.2d 963, 972–73 (Miss.1996); *In re Houston,* 314 S.C. 94, 442 S.E.2d 175, 176 (1994); *In re Shelley,* 313 S.C. 144, 437 S.E.2d 86, 88 (1993); *In re Brown,* 275

S.C. 180, 268 S.E.2d 284, 284 (1980). If the Court had to predict the law in Massachusetts, Mississippi, and South Carolina, however, the Court might not need to look any further than the first few pages of the Model Rules, which specifically limit the scope of the rules to *disciplinary* proceedings:

> The fact that a Rule is a just basis for a lawyer's self-assessment, or for sanctioning a lawyer under the administration of a disciplinary authority, does not imply that an antagonist in a collateral proceeding or transaction has standing to seek enforcement of the Rule.

Model Rules of Prof'l Conduct, Scope ¶ 18. Mississippi and South Carolina have included this admonition verbatim in their rules of professional conduct;[13] Massachusetts has included a substantially similar admonition.[14]

### b. Choice of Law for the Rules of Professional Conduct

The law of the five relevant jurisdictions is not clear, but the *choice* of law for the *rules of professional conduct* is. *See* Mod-

---

**12.** Two other cases in Massachusetts are relevant, but neither is directly on point.

In *Burrell v. Sperry Rand Corp.,* 534 F.Supp. 680 (D.Mass.1982), Judge Nelson refused to assume jurisdiction over a fee dispute among attorneys arising out of the settlement of the Delta air crash at Logan Airport. The contested agreement required one attorney to refer clients to another attorney in exchange for one-third of the fees earned. The court noted that the agreement did not violate DR 2–107 because both attorneys did substantial work on the case. The court concluded, however, that it had no jurisdiction over the dispute because the dispute was ancillary to the resolution of the claims originally brought before the court. *Id.* at 682–83.

In *Bloomenthal v. Halstrom,* No. 951773B, 1999 WL 1318980 (Mass.Super.Ct. Mar. 16, 1999), Justice Burnes refused to enforce a referral agreement because the referring attorney had a conflict of interest with the client.

**13.** Miss. Rules of Prof'l Conduct, Scope, *quoted with approval in Wilbourn v. Stennett, Wilkinson & Ward,* 687 So.2d 1205, 1215–16 (Miss.1996); S.C. Rules of Prof'l Conduct, Scope.

**14.** Mass. Rules of Prof'l Conduct, Scope ¶ 6. Similarly, the New York Code of Professional Responsibility, which directly follows the Model Code on this point, states in its "Preliminary Statement" that "[t]he Code makes no attempt to prescribe either disciplinary procedures or penalties for violation of a Disciplinary Rule, nor does it undertake to define standards for civil liability of lawyers for professional conduct." N.Y. Judiciary Law app. at 350, 355 (McKinney 1992 & Supp.2001). In contrast, and consistent with its case law, Illinois provides no limitation on the scope of its rules of professional conduct.

el Rules of Prof'l Conduct R. 8.5 (amended 1993).[15] All five jurisdictions follow Model Rule 8.5 with respect to the treatment of lawyers licensed by only one state. For such lawyers, the choice-of-law analysis is simply that the lawyer is *always* subject to the ethical obligations of the state that licensed him, regardless of where the conduct occurs. If a lawyer is licensed by more than one state, the amended version of Model Rule 8.5 provides a more complicated choice-of-law analysis, but in this dispute none of the lawyers is licensed by more than one state. Accordingly, the analysis is simple: Daynard is subject to the New York Code of Professional Responsibility and the South Carolina and Mississippi defendants are subject to their respective rules of professional conduct.

### c. Conflict of Laws

 The question before this Court is not whether to discipline any attorneys, but rather whether to enforce a contract. Thus, the Court must apply the *contract* law of the relevant *state*. "When facing a claim that does not arise under the Constitution or the laws of the United States, a federal court must apply the substantive law of the forum in which it sits, including that state's conflict-of-laws provisions." *Dykes v. DePuy, Inc.*, 140 F.3d 31, 39 (1st Cir.1998) (citing *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)).

The leading case in Massachusetts on conflict of laws is *Bushkin Associates, Inc. v. Raytheon Co.*, 393 Mass. 622, 473

**15.** The Model Rules of Professional Conduct provide:

(a) Disciplinary Authority. A lawyer admitted to practice in this jurisdiction is subject to the disciplinary authority of this jurisdiction, regardless of where the lawyer's conduct occurs. A lawyer may be subject to the disciplinary authority of both this jurisdiction and another jurisdiction where the lawyer is admitted for the same conduct.

(b) Choice of Law. In any exercise of the disciplinary authority of this jurisdiction, the Rules of Professional Conduct to be applied shall be as follows:

(1) for conduct in connection with a proceeding in a court before which a lawyer has been admitted to practice (either generally or for purposes of that proceeding), the rules to be applied shall be the rules of the jurisdiction in which the court sits, unless the rules of the court provide otherwise; and

(2) for any other conduct,

(i) if the lawyer is licensed to practice only in this jurisdiction, the rules to be applied shall be the rules of this jurisdiction, and

(ii) if the lawyer is licensed to practice in this and another jurisdiction, the rules to be applied shall be the rules of the admitting jurisdiction in which the lawyer principally practices; provided, however, that if partic-

ular conduct clearly has its predominant effect in another jurisdiction in which the lawyer is licensed to practice, the rules of that jurisdiction shall be applied to that conduct.

Model Rules of Prof'l Conduct R. 8.5 (amended 1993).

Both Illinois and New York have adopted the text of the amended version of Model Rule 8.5. Ill. Rules of Prof'l Conduct R. 8.5 (amended effective Feb. 14, 1995); N.Y.Code of Prof'l Responsibility DR 1–105 (added June 30, 1999), N.Y. Comp.Codes R. & Regs. tit. 22, § 1200.5-a (1995 & Supp.2001).

Massachusetts has adopted only part of the amended version of Model Rule 8.5:

(a) A lawyer admitted to practice in this jurisdiction is subject to the disciplinary authority of this jurisdiction, regardless of where the lawyer's conduct occurs. A lawyer may be subject to the disciplinary authority of both this jurisdiction and another jurisdiction where the lawyer is admitted for the same conduct.

Mass. Rules of Prof'l Conduct R. 8.5.

South Carolina and Mississippi still use the original version of Model Rule 8.5:

A lawyer admitted to practice in this jurisdiction is subject to the disciplinary authority of this jurisdiction although engaged in practice elsewhere.

S.C. Rules of Prof'l Conduct R. 8.5; *accord* Miss. Rules of Prof'l Conduct R. 8.5.

N.E.2d 662 (1985). *See, e.g., Millipore Corp. v. Travelers Indem. Co.*, 115 F.3d 21, 30 (1st Cir.1997) (applying *Bushkin* ). The facts of the case are as follows: A New York investment banker telephoned a corporation in Massachusetts and allegedly formed an oral agreement in which he would receive 1% of the value of a proposed acquisition. The parties later disputed the oral agreement and the dispute came before the First Circuit. The First Circuit ran into the following dilemma: if New York law governed the agreement, then the statute of frauds clearly would bar a remedy, but if Massachusetts law applied, then the statute of frauds clearly would not act as a bar. Unable to predict what law a Massachusetts court would choose, the First Circuit certified the question to the Supreme Judicial Court, which held that Massachusetts law governed the agreement.

The Supreme Judicial Court began by noting that the First Circuit was "correct in concluding that this court would not permit the choice of law question to turn on *where* the contract was made." *Id.* at 630, 473 N.E.2d 662 (emphasis added). "Almost all States have abandoned the lex loci rule and, as this case demonstrates, with good cause." *Id.* at 630–31, 473 N.E.2d 662 (citation omitted). Instead, the court applied a "functional choice-of-law approach that responds to the interests of the parties, the States involved, and the interstate system as a whole." *Id.* at 631, 473 N.E.2d 662. "One obvious source of guidance is the Restatement (Second) of Conflict of Laws (1971)." *Id.* at 632, 473 N.E.2d 662.

According to the Restatement, the factors relevant to the choice of applicable rule of law include:

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

Restatement (Second) of Conflict of Laws § 6(2) (1971). With respect to. contract actions in general, the Restatement provides:

(1) The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6.

(2) In the absence of an effective choice of law by the parties (see § 187), the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

(a) the place of contracting,

(b) the place of negotiation of the contract,

(c) the place of performance,

(d) the location of the subject matter of the contract, and

(e) the domicil, residence, nationality, place of incorporation and place of business of the parties.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

(3) If the place of negotiating the contract and the place of performance are in the same state, the local law of this

state will usually be applied, except as otherwise provided in §§ 189–199 and 203.

*Id.* § 188.

With respect to contracts in particular for the rendition of services (e.g., contracts with lawyers or brokers, *see id.* § 196 cmt. a), the Restatement provides:

> The validity of a contract for the rendition of services and the rights created thereby are determined, in the absence of an effective choice of law by the parties, by the local law of the state where the contract requires that the services, or a major portion of the services, be rendered, unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the transaction and the parties, in which the [sic] event the local law of the other state will be applied.

*Id.* § 196.

In *Bushkin,* the court rejected a mechanical approach that simply would quantify the contacts of the sort listed in section 188 and apply the law of the state with the greatest number of contacts. 393 Mass. at 632–34, 473 N.E.2d 662. "We choose, instead, to emphasize the choice-influencing factors listed in § 6(2) of the Restatement (Second) of Conflict of Laws, quoted above." *Id.* at 634, 473 N.E.2d 662. Upon reviewing the factors listed in section 6, the court concluded that none of the factors, save one, pointed clearly to one state. *Id.* at 635, 473 N.E.2d 662. The one factor the court found most instructive was the expectation of the parties:

> One significant consideration, the justified expectations of the parties, militates for Massachusetts law. Here Bushkin and Raytheon expected that any oral agreement would be enforced. Raytheon had made other, similar oral agreements to which it expected to be

bound, including others with Bushkin. Since Bushkin is not in the business of supplying free information, we may assume he expected any agreement for such information to be enforced as well.

> Finally, we note that, although the Statute of Frauds involves a question of substantive law and is not a procedural rule governed by the law of the forum, the Statute of Frauds concerns the necessary proof of a case and not the substantive merits of a plaintiff's claim. Where relevant contacts and considerations are balanced, or nearly so, we are inclined to resolve the choice by choosing that law "which would carry out and validate the transaction in accordance with intention, in preference to a law that would tend to defeat it." In this case, the law that will validate the agreement, if indeed there was an agreement, is that of Massachusetts.

*Id.* at 635–36, 473 N.E.2d 662 (citations omitted).

The South Carolina defendants argue that the alleged oral agreement was formed in Illinois, so Illinois law should apply. This is precisely the type of choice-of-law analysis condemned by *Bushkin.* Both Massachusetts and the Restatement have rejected the lex loci rule in favor of a functional analysis that looks at the interests of the parties, the states involved, and the interstate system as a whole. Under the functional test used by Massachusetts and the Restatement, it is not entirely clear what law should govern this dispute, but it is entirely clear what law should *not* govern: the law of Illinois. Illinois has absolutely no interest in the alleged contract, the parties to the contract, the subject of the contract, or the clients potentially affected by the contract. In other words, the South Carolina defendants are correct that under section 188 of the Restatement the Court should consider the

fact that the contract was formed in Illinois, but under section 6 of the Restatement—the section that takes the contacts listed in section 188 and determines which state has the greatest interest in those contacts—the Court clearly should not apply the law of Illinois to this dispute. Furthermore, to the extent Illinois law might apply, *Bushkin* instructs the Court to avoid applying the law of a state that would render the contract unenforceable, thus defeating the expectations of the parties.

In summary, the following is clear with respect to the choice-of-law analysis: Illinois law should not apply because none of the parties is licensed by Illinois and Illinois has no interest in this case. Daynard is subject to the New York Code of Professional Responsibility and the South Carolina and Mississippi defendants are subject to their respective rules of professional conduct. The code of professional responsibility in New York, along with the rules of professional conduct in Massachusetts, Mississippi, and South Carolina, all *suggest* that this Court should not allow the defendants to interpose the rule regulating fee splitting as a defense to Daynard's contract claim. One court in New York has chastised a lawyer for using public policy as a "sword for personal gain rather than a shield for the public good," but no court in Massachusetts, Mississippi, or South Carolina has addressed the relationship between contract law and the regulation of fee-splitting agreements. Under *Bushkin* and section 196 of the Restatement, the Court likely should consider Daynard's claim pursuant to the law of South Carolina or Mississippi, unless doing so would render the alleged agreement unenforceable, in which case the Court should try to fulfill the justified expectations of the parties by applying the law of a state that would enforce the agreement.[16]

Unfortunately for this Court the parties wasted all their energy arguing about Illinois and never stopped to consider what other law might apply. Accordingly, on September 13, 2001 the Court invited the parties to submit supplemental briefing on the issue. To get the ball rolling, the Court provides the following sketch of issues raised by the laws of other jurisdictions, which the parties might want to consider.

### d. The Law in Other Jurisdictions

Throughout the country, courts are divided on the question of enforcing a fee-splitting agreement that does not comply strictly with the rules of professional conduct. Years ago the state bars only permitted fee-splitting agreements that were in proportion to the services performed; this requirement reflected a hostility toward referral fees. As a result, the first court opinions on the question of enforcing

---

**16.** According to the commentary in the Restatement:

> On occasion, a state which is not the place where the contract requires that the services, or a major portion of the services, should be rendered will nevertheless, with respect to the particular issue, be the state of most significant relationship to the transaction and the parties and hence the state of the applicable law. This may be so, for example, when the contract would be invalid under the local law of the state where the services are to be rendered but valid under

the local law of another state with a close relationship to the transaction and the parties. In such a situation, the local law of the other state should be applied unless the value of protecting the expectations of the parties by upholding the contract is outweighed in the particular case by the interest of the state where the services are to be performed in having its invalidating rule applied.

Restatement (Second) of Conflict of Laws § 196 cmt. d.

a fee-splitting agreement echoed the hostility against referral fees and refused to enforce an agreement that was not strictly in proportion to the services performed. The state bars soon learned that prohibiting referral fees was both unworkable and unwise: unworkable because referring attorneys simply concocted work to "earn" their proportion of the fee and unwise because many attorneys preferred (i) risking malpractice in exchange for *all* of the fee to (ii) referring the client to a competent attorney in exchange for *part* of the fee. In other words, the state bars learned that discouraging referrals harmed clients, so the state bars sought to construct a rule on fee-splitting that would facilitate ethical referrals. The solution found in the Model Code and Model Rules is regulatory in nature: fee-splitting agreements in general are ethical if the client consents (with different state bars requiring different degrees of consent), and referral fees in particular are ethical if all the attorneys assume joint responsibility for the client. Courts that have been asked to enforce a fee-splitting agreement that does not comply strictly with these "regulations" have reached disparate results: some say an imperfect agreement violates public policy and cannot be enforced, some say public policy should not defeat an imperfect fee-splitting agreement, one looks to the totality of the circumstances, and some look to other issues to answer the question. The following paragraphs catalog the various approaches

and conclude with the approach suggested by the Restatement.

### (1) The Traditional Approach: Fee-Splitting Must Be Proportional to the Services Performed

Canon 34 of the American Bar Association's Canons of Professional Ethics required fee-splitting to be proportional to the services performed. Thus three early cases, one in Kansas, one in Missouri, and one in Washington,[17] all refused to enforce a referral agreement because the referring attorney did nothing more than sell the client to another attorney. Today most states will allow a simple referral agreement provided that all of the attorneys assume, in writing, joint responsibility for the representation. Absent joint responsibility, however, the traditional requirement of proportionality remains. Thus two recent cases in Louisiana, like an earlier case in Washington, refused to enforce a disproportionate agreement even though the agreement was more than a mere referral agreement; instead the courts enforced the agreement to the extent that the division was proportional.[18] On the other hand, assuming that the fee-splitting agreement was more than a simple referral agreement and the division was *roughly* proportional, courts in Colorado, Georgia, New York, Oregon, and Washington have suggested that a court should not require the division to be *exactly* proportional: [19] "as long as both attorneys have

---

**17.** *Palmer v. Breyfogle*, 217 Kan. 128, 535 P.2d 955, 967–69 (1975); *McFarland v. George*, 316 S.W.2d 662, 670–74 (Mo.Ct.App. 1958); *Belli v. Shaw*, 98 Wash.2d 569, 657 P.2d 315, 319 (1983) (en banc).

**18.** *In re P & E Boat Rentals, Inc.*, 928 F.2d 662, 665 (5th Cir.1991) (applying Louisiana law); *Bertucci v. McIntire*, 693 So.2d 7, 9 (La.Ct.App.1997); *McNeary v. Am. Cyanamid Co.*, 105 Wash.2d 136, 712 P.2d 845, 848–49 (1986) (en banc).

**19.** *Rutenbeck v. Grossenbach*, 867 P.2d 36, 37–38 (Colo.Ct.App.1993) (citing California, Oregon, and Washington authority); *Nickerson v. Holloway*, 220 Ga.App. 553, 469 S.E.2d 209, 210 (1996) (citing Illinois and New York authority); *Benjamin v. Koeppel*, 85 N.Y.2d 549, 626 N.Y.S.2d 982, 650 N.E.2d 829, 832 (1995); *Fitzgibbon v. Carey*, 70 Or.App. 127, 688 P.2d 1367, 1374 (1984) (citing California authority); *McNeary v. Am. Cyanamid Co.*, 105 Wash.2d 136, 712 P.2d 845, 848 (1986)

done some work on the case beyond signing and referring the client, the courts will not engage in the cumbersome task of evaluating after the fact the relative contributions made by the bickering attorneys." [20]

### (2) One Modern Approach: Public Policy Prohibits Enforcement of an Imperfect Fee–Splitting Agreement

California and Illinois, which both prohibit fee-splitting agreements unless the client consents *in writing*, will not enforce an *oral* fee-splitting agreement as matter of public policy because such an agreement does not comply strictly with the rules of professional conduct.[21] Alaska, Minnesota, Missouri, New Hampshire, and Texas have also held that public policy prohibits enforcement of an imperfect fee-splitting agreement.[22]

### (3) Another Modern Approach: Public Policy Should Not Defeat an Imperfect Fee–Splitting Agreement

In general, the rules of professional conduct and the code of professional responsibility only apply to *disciplinary* proceedings and do not create civil liability. For example, the "scope" of the rules of professional conduct in Massachusetts, Mississippi, and South Carolina state that a disciplinary violation does not necessarily give an "antagonist in a collateral proceeding" standing to enforce the rule. Courts in Indiana, Delaware, and Florida have relied on the limited scope of the rules of professional conduct to allow enforcement of an imperfect fee-splitting agreement;[23] a court in Georgia, which also enforced an imperfect fee-splitting agreement, noted that any ethical complaints should be directed to the board of bar overseers.[24] Courts in New York and West Virginia have enforced an imperfect fee-splitting

(en banc) (citing California and Oregon authority).

**20.** *Nickerson*, 469 S.E.2d at 210.

**21.** *Chambers v. Kay*, 106 Cal.Rptr.2d 702, 713–15 (Cal.App.2001), *review granted*, 109 Cal.Rptr.2d 301, 26 P.3d 1039 (Cal.2001); *Scolinos v. Kolts*, 37 Cal.App.4th 635, 44 Cal. Rptr.2d 31, 33–34 (1995); *Holstein v. Grossman*, 246 Ill.App.3d 719, 186 Ill.Dec. 592, 616 N.E.2d 1224, 1229–36 (1993), *quoted with approval in Kaplan v. Pavalon & Gifford*, 12 F.3d 87, 89–92 (7th Cir.1993). "Substantial compliance" with the rules *might* overcome public policy in Illinois, but not in California. *Compare Davies v. Grauer*, 291 Ill.App.3d 863, 225 Ill.Dec. 933, 684 N.E.2d 924, 927–29 (1997) (allowing oral consent), *and Phillips v. Joyce*, 169 Ill.App.3d 520, 120 Ill.Dec. 22, 523 N.E.2d 933, 939 (1988) (allowing written, but not fully informed, consent), *with Chambers*, 106 Cal.Rptr.2d at 716 (rejecting "substantial compliance"), *and Holstein*, 186 Ill.Dec. 592, 616 N.E.2d at 1235 ("Absent ... written consent, there can be no substantial compliance."). Conversely, estoppel *might* over-

come public policy in California, but not in Illinois. *Compare Chambers*, 106 Cal.Rptr.2d at 715 n. 9, *with Holstein*, 186 Ill.Dec. 592, 616 N.E.2d at 1236.

**22.** *In re Estate of Katchatag*, 907 P.2d 458, 463–65 (Alaska 1995) (citing Illinois authority); *Christensen v. Eggen*, 577 N.W.2d 221, 224–25 (Minn.1998) (en banc); *Londoff v. Vuylsteke*, 996 S.W.2d 553, 558 (Mo.Ct.App. 1999) (citing *McFarland v. George*, 316 S.W.2d 662, 670 (Mo.Ct.App.1958)); *Kalled v. Albee*, 142 N.H. 747, 712 A.2d 616, 618 (1998) (citing Illinois and Texas authority); *Lemond v. Jamail*, 763 S.W.2d 910, 914 (Tex.App. 1988). *But see Chachere v. Drake*, 941 S.W.2d 193, 195–96 (Tex.App.1996) (enforcing imperfect fee-splitting agreement to prevent fraud).

**23.** *Freeman v. Mayer*, 95 F.3d 569, 575–76 (7th Cir.1996) (applying Indiana law); *Potter v. Peirce*, 688 A.2d 894, 896–97 (Del.1997); *Miller v. Jacobs & Goodman, P.A.*, 699 So.2d 729, 732 (Fla.Ct.App.1997).

**24.** *Nickerson v. Holloway*, 220 Ga.App. 553, 469 S.E.2d 209, 210 n. 1 (1996).

agreement on the basis of ABA Informal Opinion No. 870,[25] which states that "[w]hen two lawyers have participated in an unethical agreement[,] one of them should not, where no one else is involved, set up the unethical agreement against the other." A court in Ohio estopped an attorney, who had employed another attorney with a promise to share the fees, from later pointing to a lack of client consent as a basis for refusing to honor the promise.[26]

### (4) A Compromise Approach: Consider the Equities of the Case

In *Post v. Bregman,* 349 Md. 142, 707 A.2d 806 (1998), the court canvassed all the law and concluded that *clear and flagrant* violations of the rule regulating fee-splitting *may* render an agreement unenforceable:

> When presented with a defense resting on Rule 1.5(e), the court must look to all of the circumstances—whether the rule was, in fact, violated, and, if violated (1) the nature of the alleged violation, (2) how the violation came about, (3) the extent to which the parties acted in good faith, (4) whether the lawyer raising the defense is at least equally culpable as the lawyer against whom the defense is raised and whether the defense is being raised simply to escape an otherwise valid contractual obligation, (5) whether the violation has some particular public importance, such that there is a public interest in not enforcing the agreement, (6) whether the client, in particular, would be harmed by enforcing the

agreement, and, in that regard, if the agreement is found to be so violative of the Rule as to be unenforceable, whether all or any part of the disputed amount should be returned to the client on the ground that, to that extent, the fee is unreasonable, and (7) any other relevant considerations. We view a violation of Rule 1.5(e), whether regarded as an external defense or as incorporated into the contract itself, as being in the nature of an equitable defense, and principles of equity ought to be applied.

*Id.* at 819 (footnote omitted); *see also Edell & Assocs., P.C. v. Law Offices of Peter G. Angelos,* 264 F.3d 424, 441–44 (4th Cir.2001) (applying *Post* ).

### (5) Other Considerations

In considering the question of fee-splitting agreements, courts have also considered the following issues: Was the plaintiff a "nonlawyer" ineligible to share fees with a "lawyer"? Did the plaintiff work so closely with the defendant as to form a "joint venture" immune from the regulations on fee splitting? Conversely, was the plaintiff's work so removed from the client as to exempt the plaintiff from the regulations on fee splitting? The following discussion considers each issue in turn. *First,* if the plaintiff is a "nonlawyer," then no state would allow him to share fees with a "lawyer." [27] In general lawyers may *pay* nonlawyers for services, and may even share *profits* with nonlawyers (usually assistants within the firm), but under no

**25.** *Benjamin v. Koeppel,* 85 N.Y.2d 549, 626 N.Y.S.2d 982, 650 N.E.2d 829, 832–33 (1995) (alternative holding); *Watson v. Pietranton,* 178 W.Va. 799, 364 S.E.2d 812, 815–16 (1987).

**26.** *King v. Housel,* 52 Ohio St.3d 228, 556 N.E.2d 501, 504–05 (1990); *see also Chambers v. Kay,* 106 Cal.Rptr.2d 702, 715 n. 9 (Cal.App.2001) (voiding imperfect fee-splitting

agreement as matter of public policy but noting that equitable estoppel could overcome public policy), *review granted,* 109 Cal.Rptr.2d 301, 26 P.3d 1039 (Cal.2001).

**27.** *See generally* Model Code of Prof'l Responsibility DR 3–102; Model Rules of Prof'l Conduct R. 5.4; Restatement (Third) of the Law Governing Lawyers § 10.

circumstances may a lawyer split a particular fee with a nonlawyer. For this reason, one court in Arizona refused to enforce a fee-splitting agreement between an Illinois lawyer and an Arizona lawyer: the Illinois lawyer was not admitted to the bar of Arizona, so he was just another "nonlawyer" in the eyes of the Arizona court.[28] The notion that a lawyer is only a "lawyer" in the state that licenses him might be a shock to many, but California recently subscribed to this vision when it prohibited a New York law firm from collecting fees for legal services performed in California. According to the California Supreme Court, the New York law firm was not licensed to "practice" law "in California," so the California client was not required to pay.[29] *Second,* courts in California, Georgia, Illinois, Louisiana, and Oregon have said that lawyers who work closely together but do not comply with all the requirements on fee splitting may be able to characterize the relationship as an "association" or "joint venture," which would not be subject to the regulations on fee splitting because joint venturers have a fiduciary duty to each other and are presumed to share profits equally.[30] *Third,* one court

in Texas, relying on a comment in the Texas Rules of Professional Conduct, enforced an imperfect fee-splitting agreement because there was "no disclosure of client confidences to the forwarding attorney and no financial impact on the client."[31] In other words, Texas will except from the fee-splitting regulations any arrangement where the attorney's work is so removed from the client as to render the protection of the regulations meaningless.

### (6) The Restatement's Approach

The Restatement, which takes the approach that a client must be informed of the division of fees and not object, provides the following guidance on the subject:

> *i. Sanctions; questions of the enforceability of improper agreements.* A fee-splitting agreement that violates this Section [47] renders the participating lawyers subject to professional discipline (see § 5). It also cannot be enforced against the client, may lead to partial or total forfeiture of the lawyers' fee claim (see § 37), and may form the basis for a

---

**28.** *Peterson v. Anderson,* 155 Ariz. 108, 745 P.2d 166, 169–71 (1987) (distinguishing *Dietrich Corp. v. King Res. Co.,* 596 F.2d 422 (10th Cir.1979) (allowing professor in, but not licensed by, Colorado to share fee with Colorado law firm)). *But see Freeman v. Mayer,* 95 F.3d 569 (7th Cir.1996) (enforcing imperfect fee-splitting agreement between Illinois and Indiana attorneys).

**29.** *Birbrower, Montalbano, Condon & Frank v. Superior Court,* 17 Cal.4th 119, 70 Cal.Rptr.2d 304, 949 P.2d 1 (1998), *criticized in* Restatement (Third) of the Law Governing Lawyers § 3 reporter's note e.

**30.** *Sims v. Charness,* 86 Cal.App.4th 884, 103 Cal.Rptr.2d 619, 622–25 (2001); *Nickerson v. Holloway,* 220 Ga.App. 553, 469 S.E.2d 209, 210–11 (1996); *Holstein v. Grossman,* 246 Ill.App.3d 719, 186 Ill.Dec. 592, 616 N.E.2d

1224, 1236–38 (1993); *Scurto v. Siegrist,* 598 So.2d 507, 509–10 (La.Ct.App.1992); *Fitzgibbon v. Carey,* 70 Or.App. 127, 688 P.2d 1367, 1374 (1984).

**31.** *Bond v. Crill,* 906 S.W.2d 103, 106 (Tex. App.1995), *appeal after remand,* —— S.W.3d ——, 2001 WL 1231865 (Tex.App.2001). According to the commentary to the Texas Rules of Professional Conduct:

> [I]f a lawyer hires a second lawyer for consultation and advice on a specialized aspect of a matter and that consultation will not necessitate the disclosure of confidential information and the hiring lawyer both absorbs the entire cost of the second lawyer's fees and assumes all responsibility for the advice ultimately given the client, a division of fees within the meaning of this Rule is not involved.

Tex. Rules of Prof'l Conduct R. 1.04 cmt. 10.

claim by the client of restitution of the portion of the fee paid to the forwarding lawyer (see § 6, Comment *d*). Some urge that lawyers who enter into an improper fee-splitting arrangement should be able to enforce it against each other, reasoning that neither may charge the other with an impropriety to which both agreed, and that the prohibition on fee-splitting protects clients rather than lawyers. Enforcement, however, encourages lawyers to continue entering into improper fee-splitting agreements. Accordingly, a lawyer who has violated a regulatory rule or statute by entering into an improper fee-splitting arrangement should not obtain a tribunal's aid to enforce that arrangement, unless the other lawyer is the one responsible for the impropriety. On the other hand, although most lawyer codes on the subject require that a fee-splitting agreement be in writing (and the absence of a writing is a disciplinary violation), when the fact of such agreement is clearly established, the absence of a writing by itself should not affect the rights of the lawyers between themselves.

It is appropriate for the tribunal in which is pending either a separate suit between the lawyers or a suit to which the fee dispute is ancillary (see § 42) to require notification to the client so that the client, if so disposed, may assert a claim to a refund of all or part of the fee.

Restatement (Third) of the Law Governing Lawyers § 47 cmt. i; *see also* 1 Geoffrey C. Hazard, Jr. & W. William Hodes, *The Law of Lawyering* § 8.16, at 8–40 to –41 (3d ed.2001); Caroll J. Miller, Annotation, *Validity and Enforceability of Referral Fee Agreement Between Attorneys*, 28 A.L.R.4th 665 (1984 & Supp.2000).

### e. The Relevant Question

None of the preceding authorities has suggested what should happen if the plaintiff and defendant are subject to different rules of professional conduct, the plaintiff complied with his rules of professional conduct, the defendant did not comply with his rules of professional conduct, the state that licensed the plaintiff would not use public policy to defeat imperfect fee-splitting agreements, the state that licensed the defendant would use public policy to defeat imperfect fee-splitting agreements, the state with the most interest in the agreement is the state that licensed the defendant, and the plaintiff is suing in a state that did not license any of the lawyers in the dispute. This is the conundrum potentially facing this Court but completely ignored by the parties. Accordingly, the parties have been given an opportunity to rectify their silence with supplemental briefing.

### III. CONCLUSION

For the reasons stated above, on September 13, 2001 the South Carolina defendants' motion for summary judgment [Docket No. 21] was DENIED with respect to the release and quantum meruit, but taken under advisement with respect to enforcing the alleged oral fee-splitting agreement. The South Carolina defendants were ordered to notify their clients about Daynard's complaint within thirty days so that the clients, if so disposed, may object to Daynard's claim or assert their own claim to a refund of all or part of the fee. Both parties, along with the clients, were invited to brief the following questions:

1. Assuming Illinois law does not apply, what law should govern the alleged fee agreement? How do the laws that could, but do not, apply conflict with the law that should apply?

2. Which disciplinary authorities could have jurisdiction over the lawyers involved in the alleged fee agreement? With respect to each lawyer involved in the alleged fee agreement, which disciplinary authority should have jurisdiction? How do the disciplinary rules that could, but do not, apply conflict with the disciplinary rules that should apply?

3. How should alleged disciplinary violations by the plaintiff affect the validity of the alleged fee agreement? By the defendants? By both?